### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| LIFE SETTLEMENTS ABSOLUTE RETURN I, LLC, *et al.*, | Case No. 17-13030 (   ) |
| Debtors.[1] | (Joint Administration Requested) |

### DECLARATION OF ROBERT J. DAVEY, III IN SUPPORT OF
### CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Robert J. Davey, III, hereby declare under penalty of perjury:

1.  I am the Secretary/Treasurer of The Attilanus Fund I, L.P. ("**Attilanus**"), which is the sole member of Life Settlements Absolute Return I, LLC, a limited liability company organized under the laws of the State of Delaware ("**LSAR**"), and the Secretary/Treasurer of Senior LS Holdings, LLC, a limited liability company organized under the laws of the State of Delaware ("**Senior LS**," and collectively with LSAR, the "**Debtors**").

2.  Attilanus' general partner is Anysia Financial Management, LLC ("**Anysia**"), which conducts and manages the business of Attilanus.  I am a director of Anysia and also serve as its Secretary/Treasurer.

3.  Prior to these chapter 11 filings (collectively, the "**Chapter 11 Cases**"), Attilanus, Anysia, and LSAR all executed corporate resolutions designating me the

---

[1] The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Life Settlements Absolute Return I, LLC (7992) and Senior LS Holdings, LLC (5731).  The mailing address for the Debtors, solely for purposes of notices and communications, is: 2131 Woodruff Road, Suite 2100-117, Greenville, South Carolina 29607, with copies to Nelson Mullins Riley & Scarborough, LLP, c/o Shane G. Ramsey, 150 Fourth Avenue North, Suite 1100, Nashville, TN 37219 and Bayard, P.A., c/o Evan T. Miller, 600 N. King Street, Suite 400, Wilmington, DE 19801.

individual responsible for all decision-making aspects of LSAR's restructuring. Additionally, prior to these Chapter 11 Cases, Senior LS executed a corporate resolution designating me the individual responsible for all decision-making aspects of Senior LS' restructuring.

4.     In these capacities, I am generally familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.

5.     On December 29, 2017, (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States (the "**Bankruptcy Code**"). The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As stated herein, the Debtors are seeking to jointly administer their bankruptcy cases.

6.     To enable the Debtors to minimize the adverse effects of the commencement of these Chapter 11 Cases on their businesses, the Debtors have requested various types of relief in their "first day" motions (each, a "**First Day Motion**" and collectively, the "**First Day Motions**"). The First Day Motions seek relief intended to allow the Debtors to perform and meet those obligations necessary to fulfill their duties as debtors-in-possession in these Chapter 11 Cases.  I am familiar with the contents of each First Day Motion (including the exhibits thereto), and I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity or value; (b) constitutes a critical element to achieving a successful reorganization of the Debtors; and (c) best serves the Debtors' estates and creditors' interests.

{BAY:03157446v9}

7.     Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, or information supplied to me by other members of the Debtors' management and the Debtors' professionals. I am authorized to submit this Declaration on behalf of the Debtors, and if called upon to testify, I could and would testify competently to the facts set forth herein.

**I.        The Debtors' Corporate Structure**

**A.     LSAR**

8.     LSAR was incorporated in Delaware on May 22, 2008 as a limited liability company.  LSAR's principal place of business is located at 2131 Woodruff Road, Suite 2100-117, Greenville, South Carolina 29607.

9.     In June 2008, Attilanus became the sole member of LSAR, and as such, LSAR is a wholly-owned subsidiary of Attilanus.

10.     Attilanus is a Delaware limited partnership formed on January 29, 2004 as The Atticus Fund I, L.P.  The Atticus Fund I, L.P. changed its name to Attilanus by amending its certificate of limited partnership on March 30, 2007.  Attilanus' general partner is Anysia, a Delaware limited liability company formed on May 13, 2003.

11.     Anysia conducts and manages the business of Attilanus and is managed through its three-person Board of Directors, consisting of Ron Klink, Patrick E. Griffin, and me.  Patrick E. Griffin serves as President of Anysia, Ron Klink serves as a director, and I serve as Secretary/Treasurer.

12.     Except as discussed in paragraph 3, Erin Pittman is the manager of LSAR and is responsible for the day-to-day operation and the general management of the

business and affairs of LSAR.  Paul Bishop serves as LSAR's independent manager.
LSAR has no employees, but engages certain consultants and contractors as discussed
more fully below.

### B.    Senior LS

13.    Senior LS was incorporated in Delaware on August 9, 2007 as a limited
liability company.

14.    In June 2008, LSAR became the sole member of Senior LS and, as such,
Senior LS is a wholly-owned subsidiary of LSAR.

15.    Except as discussed in paragraph 3, Paul Bishop is the independent
manager of Senior LS and is responsible for the day-to-day operation and the general
management of the business and affairs of Senior LS.  Senior LS has no employees.

## II.        The Debtors' Businesses

16.    LSAR was formed as a special purpose vehicle to invest in life insurance
policies (each a "**Policy**" and collectively, the "**Policies**") in the life settlement market.
LSAR does not conduct any other significant business activities. Based upon these
limited business activities, LSAR has comprehensive agreements with third-parties for
the provision of management, administrative and operational services.

17.    The Policies were issued by leading insurance companies upon
individuals (the "**Insureds**") who are generally wealthy and desire to sell their Policies
and the related benefits rather than surrender them to the issuing insurance company for
less value.

18.    In connection with the 2008 Transaction (as defined below), all of the
assets, including the Policies, held by S&Y Life Settlements I, LLC and any Policies

held by LSAR were transferred to Senior LS, such that following the 2008 Transaction, all of the Policies are held by Senior LS for the benefit of LSAR.

19.    Other than operating as a holding company for the Policies, Senior LS conducts no business and has no employees.

20.    Through the 2008 Transaction, LSAR became the sole member of Senior LS, and at the time of such transaction, the Policies had a total death benefit value of approximately $212 million.  LSAR purchased the Policies at prices expected to yield a profit, and thereby permit payment in full to LSAR's holders of the 2008 Notes (as defined below) upon the payment of the death benefit proceeds of the Policies to LSAR.

21.    The Policies acquired in the 2008 Transaction had an insured life expectancy of approximately four and a half to eight and a half additional years.

22.    While the Debtors have no employees, Anysia engages Clear View Advisors Corporation ("**CVACorp**") to provide services relating to the preparation of monthly reports to the indenture trustee, Wells Fargo Bank, National Association ("**Wells Fargo**") in accordance with the Indenture (defined below).  CVACorp is paid by Anysia.  In addition to providing monthly reports to Wells Fargo, CVACorp provides administrative and accounting services, maintains a general ledger for each entity within the Debtors' corporate structure, responds to information requests from stakeholders, prepares annual financial reports and inventory analyses covering the portfolio's underlying Insureds, monitors monthly mortality reviews, coordinates site visits with third-party contractors for the purpose of monitoring the population of Insureds, reviews and responds to correspondence from issuing life insurance carriers, analyzes cost of insurance for the Policies, prepares and reviews monthly premium payment and other

payables for submission to Wells Fargo, files benefit claims related to the Policies, and acquires all necessary notifications and certificates for benefit claim processing, and other miscellaneous information requests as required from time-to-time.

### III.        Life Insurance Settlement Policy Transactions

23.        Traditionally, life insurance buying decisions are built around two basic tenets: (i) protection against the adverse financial consequences of death and (ii) financial planning goals.  Of course, circumstances can change and thereby reduce either the need for death protection proceeds or the value of tax advantages associated with a life insurance policy, or both.

24.        When an individual determines that they no longer require the protections afforded by a policy, they have a number of options.  First, an individual may choose to surrender a policy with cash value to the insurance company, thereby allowing that individual to receive payment equal to the premiums previously paid as well as the earnings (if any) on the policy, minus the cost of the insurance protection and any surrender charges.  When policies are surrendered for cash, however, the individual policy holder is required to pay capital gains taxes on any profit received from the cash surrender value of the policy.  Second, an individual can elect to cease payments of insurance premium to the insurance company.  When an individual ceases payments of insurance premiums, however, the policy lapses and the insured receives no death benefit proceeds and loses a potentially significant portion of the value of premiums that had been paid to the insurance company.  Third, to the extent permitted by the terms of the applicable policy, an insured may elect to cancel their policy and receive a minimal

cash payout from the insurance company.  Finally, an insured may choose to enter into a life settlement transaction by selling their insurance policy.

25.     Life insurance settlement policy transactions ("**Settlement Policy Transactions**") represent a secondary market within the life insurance sector that involves acquiring policies from individual insureds. Life insurance carries a dynamic market value that can be independently appraised, in the same way as stocks, bonds and real estate. As a result, consumers that no longer require the death benefit proceeds under a policy can realize significantly more than cash surrender value for unneeded or underperforming policies.

26.     In a Settlement Policy Transaction, a policy is purchased by an investor at a discount to the ultimate benefit to be paid upon the death of the insured, but at a price higher than the corresponding cash surrender value of the policy. A Settlement Policy Transaction does not involve the surrender of a policy, but rather, a transfer of ownership of the policy to the investor, who then becomes the beneficiary of the policy.   The investor may, in turn, aggregate the policies purchased in a Settlement Policy Transaction for purposes of obtaining financing or for sale to third-parties. Upon purchasing a policy, the investor maintains such policy by paying the premiums and any related costs (collectively, the "**Premiums**") until the insured passes away. At such time, the investor, as the owner and beneficiary of the policy, is entitled to the death benefit proceeds.

## IV.      LSAR's Indebtedness

### A. The 2008 Transaction and the 2008 Notes

27.     On June 12, 2008, LSAR entered into that certain Trust Indenture dated June 12, 2008 (the "**Indenture**") with Wells Fargo as Policy Administrator and Trustee,

whereby LSAR issued preference notes in the principal amount of $40 million (the "**Preference Notes**"), mezzanine notes in the principal amount of $24 million (the "**Mezzanine Notes**"), and residual notes in the amount of $110,222,499 (the "**Residual Notes**," and collectively with the Preference Notes and the Mezzanine Notes, the "**2008 Notes**").  The Indenture further authorized LSAR to incur credit pursuant to a credit facility in an amount no more than $15 million.

28.     In connection with its role as Policy Administrator under the Indenture, Wells Fargo (i) has physical possession of each Policy; (ii) receives and processes all life insurance carrier correspondence; and (iii) holds all of LSAR's cash for disbursement in accordance with the terms of that certain Policy Administration Agreement dated June 12, 2008 (the "**Policy Administration Agreement**").

29.     The proceeds received from the issuance of the 2008 Notes were used to (i) purchase Senior LS and S&Y Life Settlements I, LLC (the original owners of certain of the Policies); (ii) purchase additional Policies; and (iii) fund various accounts necessary to service the Policies (such transaction referred to as the "**2008 Transaction**").

30.     As of the Petition Date, the Preference Notes were held by Ensign Peak Advisors, Inc. ("**Ensign Peak**"), the Mezzanine Notes were held by (i) Attilanus ($8,600,000); (ii) The Eastman Retirement Assistance Plan Trust ($1,000,000); and (iii) Beaver County Pension Plan ($14,400,000), and the Residual Notes were held by Attilanus.

31.     Pursuant to the Indenture, LSAR pledged, among other things, the Policies and the proceeds thereof to Wells Fargo to secure payment of the 2008 Notes

and the Credit Facility (as defined below) issued by GERS (as defined below). As a result, GERS, Ensign Peak Advisors, Inc., The Eastman Retirement Assistance Plan Trust, and Beaver County Pension Plan are secured by the proceeds from the Policies (collectively, the "**Secured Creditors**").[2]

32.     Under the Indenture, the Preference Notes have limited priority over the Mezzanine Notes, while the Residual Notes are fully subordinated to the Preference Notes and the Mezzanine Notes (the Preference Notes and Mezzanine Notes are sometimes collectively referred to as the "**Senior Notes**").

33.     Payment of the 2008 Notes is governed by the following "waterfall" set forth in the Indenture: (i) first, expenses of the Trustee and those related to administration of the trust; (ii) second, payments to the lender on the credit facility; (iii) third, interest payments, paid on a pro rata basis, to the Preference Note Holders; (iv) fourth, interest payments, paid on a pro rata basis, to the Mezzanine Note Holders; (v) fifth, payments of principal, on a pro rata basis, to the Preference Note Holders; (vi) sixth, payments of principal, on a pro rata basis, to the Mezzanine Note Holders; and (vii) seventh,  payments, on a pro rata basis, to the Residual Note Holders.

34.     The Senior Notes mature on June 10, 2018.

35.     The Residual Notes do not have a maturity date.

---

[2] The Debtors are in the process of investigating the validity of the Secured Creditors' prepetition liens on the Policies and, as a result, fully reserve their rights to later challenge, if appropriate, the secured status of any, or all, of the Secured Creditors.  Nothing herein shall be construed as an admission as to the validity of any prepetition liens nor as a waiver of the right to later challenge such liens, all such rights being expressly reserved.

### B. The Credit Facility

36.    Beginning in July 2009, in order to fund premium payments on the Policies, and as provided for in the Indenture, LSAR (as the borrower) and the Employees' Retirement System of the Government of the Virgin Islands ("**GERS**") and Attilanus (as lenders) extended a credit facility to LSAR, whereby Attilanus made an initial loan to LSAR in the principal amount of $500,000 and GERS made a loan to LSAR in the principal amount of $1,160,263 (collectively, the "**Credit Facility**").

37.    On July 11, 2012, LSAR, GERS, and Attilanus entered into an Amended and Restated Loan Agreement, whereby GERS made additional loans to LSAR in an aggregate principal amount not to exceed $8,839,733, thus increasing LSAR's indebtedness to GERS under the Credit Facility to approximately $10 million.

38.    The Credit Facility originally matured on July 10, 2017 (the "**Original Credit Facility Maturity Date**").

39.    Prior to the Original Credit Facility Maturity Date, LSAR actively engaged GERS in negotiations regarding a workout of the Credit Facility.  While LSAR was unable to achieve a workout of the Credit Facility, it did obtain an extension of the Original Credit Facility Maturity Date.  On August 7, 2017, GERS agreed to extend the Original Credit Facility Maturity Date to December 31, 2017 (the "**Extended Credit Facility Maturity Date**").  In exchange for agreeing to this extension, GERS increased the interest rate on the Credit Facility from 15% to 17%.

### C.      General Unsecured Debt Obligations

40.      As set forth in the consolidated list of the Debtors Thirty Largest Unsecured Creditors, the Debtors have nominal unsecured debt related primarily to the monthly operational expenses for administration and management of the Policies.

41.      Due to the limited nature of the Debtors' businesses and operations, there are no other significant known creditors.

### V.      Events Leading To Chapter 11

42.      Since the establishment of the Credit Facility, GERS advanced funds to LSAR as follows: (i) $4.1 million in July 2012; (ii) $3 million in April 2014; and (iii) $2.5 million in September 2014.

43.      Because the Insureds have outlived their actuarial life expectancy, thereby prolonging LSAR's receipt of cash from the death benefits of the Policies, it became financially difficult for LSAR to continue servicing Premium payments on the Policies.   As a result of this unexpected development, Attilanus solicited financial assistance from each of the participants in its fund, but was unsuccessful in obtaining a capital infusion.

44.      On December 18, 2014, in order to remit Premium payments on the Policies – LSAR's most significant assets – and to otherwise continue operating its business, LSAR requested that GERS distribute the remaining $300,000 under the Credit Facility and also requested the extension of additional credit under the Credit Facility in the amount of $2.7 million.

45.      On January 23, 2015, GERS approved this request.  But this came at a price.  In consideration for increasing the Credit Facility (which LSAR requested out of

pure necessity to protect the value of the business for the benefit of its creditors and stakeholders), GERS instructed LSAR to immediately begin liquidating its Policies in an attempt to ensure that LSAR would have cash available to satisfy the Credit Facility on the Extended Credit Facility Maturity Date (the "**Policy Liquidation Demand**"). GERS also advised LSAR that it would not make any additional extensions of credit under the Credit Facility.

46.    With little choice in the matter, beginning in the second quarter of 2015, LSAR assembled an initial bid portfolio to market and sell certain of its Policies on the open market to third parties in order to satisfy the Policy Liquidation Demand.

47.    The market dictates the amount received from the sale of any policy, and that amount is well below the face value of such policy. The sale of policies to third parties on the open market generally results in the seller incurring an 80% loss.

48.    The negative effects of selling policies at such a discount are twofold. First, the seller is left with significantly less cash to meet its operating expenses. Second, the value of the seller's business is further damaged inasmuch as the sale of policies has the effect of reducing the average life expectancy of the insureds remaining in the seller's portfolio. As a result of the Policy Liquidation Demand, LSAR experienced these exact negative impacts to its business.

49.    Indeed, as a result of selling Policies from 2015 through 2017, LSAR's future cash flow was reduced by approximately $63.2 million, in exchange for net proceeds of approximately $13.3 million (i.e., 21% of the benefits sold). Further, the average life expectancy of the Insureds remaining in LSAR's portfolio of Policies was reduced by nearly 1 year.

50.     As a result of the Policy Liquidation Demand, LSAR's business was negatively impacted in a significant way, which has harmed all creditors and stakeholders.

## VI.        Current Conditions

51.     As of the Petition Date, LSAR's major credit obligations are as follows: (i) $15 million owing to GERS under the Credit Facility; (ii) $73.8 million owing on the Preference Notes; (iii) $45.4 million owing on the Mezzanine Notes; and (iv) $110,222,499 owing on the Residual Notes.  Senior LS has no creditors.

52.     As of the Petition Date, LSAR's portfolio of Policies consisted of policies on 44 Insureds.  The Insureds have an average age of 85 years, with individual ages ranging from 67 years to 94 years.  The value associated with these 44 Policies is approximately $20.1 million, which is based on an allocation of the valuation set on December 31, 2016 from the actuarial valuation of LSAR's portfolio of Policies.  It is allocated on a straight-line basis (Face Amount / Total Benefit) x Portfolio valuation). The current portfolio value is determined based on the December 31, 2016 valuation, less activity in 2017 resulting from sales of certain Policies and benefits received.

53.     The cost to service premium payments on the Policies over the next two years is approximately $7.9 million, or approximately $328,000 per month, and the cost to fund the ongoing operations of the fund is approximately $20,000 to $25,000 per month.

54.     The Debtors currently have approximately $8.3 million in cash and an estimated amount of $4.3 million in proceeds from Policy sales currently under contract for a total of cash and estimated cash receipts of approximately $12.6 million.

55.     LSAR, in conjunction with its non-debtor affiliates such as Attilanus, has sought, and continues to seek, a capital infusion, lender financing, and alternate lending sources to retire the Credit Facility, and thereby eliminate the negative effects to its business associated with the Policy Liquidation Demand.  Indeed, over the past year, LSAR and Attilanus have made requests to both GERS and Ensign Peak to extend additional credit to fund the Premiums or to purchase Policies.  Neither GERS nor Ensign Peak have responded to these requests.  In addition to GERS and Ensign Peak, LSAR has sought additional financing from at least two other entities.

56.     As a result of the inability to obtain additional sources of capital, and with the Extended Credit Facility Maturity Date fast approaching, the Debtors had no choice but to initiate these Chapter 11 Cases.

**VII.     Facts in Support of First Day Motions**

57.     Contemporaneously with this Declaration, the Debtors have filed a number of First Day Motions[3] in these Chapter 11 Cases, seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these Chapter 11 Cases, and lessen the impact of these Chapter 11 Cases on the Debtors' day-to-day operations. I believe that the relief requested in the First Day Motions is necessary to avoid immediate and irreparable harm and allow to the Debtors to operate with minimal disruption during the pendency of these Chapter 11 Cases.  A description of the relief requested in and the facts supporting each of the First Day Motions is briefly set forth below:

---

[3] Capitalized terms used but not defined in this Declaration have the meanings ascribed to them in the relevant First Day Motions.

### A. Debtors' Motion for Entry of an Order Authorizing the Joint Administration of these Chapter 11 Cases (the "*Joint Administration Motion*")

58.     In the Joint Administration Motion, the Debtors seek entry of an order (i) directing joint administration of these Chapter 11 Cases for procedural purposes only, and (ii) directing parties in interest to use a consolidated caption indicating that any pleading they file relates to the jointly administered bankruptcy cases of "Life Settlements Absolute Return I, LLC, and Senior LS Holdings, LLC."

59.     The Debtors are "affiliates" of each other as that term is defined in section 101(2) of the Bankruptcy Code and as used in Bankruptcy Rule 1015(b), as Life Settlements Absolute Return I, LLC, owns 100% of the membership interest in Senior LS Holdings, LLC. Further, the Debtors comprise a single business with highly integrated operations. Thus, joint administration of the Debtors' cases is appropriate under Bankruptcy Rule 1015(b) and Local Rule 1015-1.

60.     The joint administration of the Debtors' Chapter 11 Cases will permit the Clerk of the Court to use a single general docket for each of the Debtors' cases and to combine notices to creditors and other parties in interest of the Debtors' respective estates. Indeed, the Debtors anticipate that numerous notices, applications, motions, other pleadings, hearings, and orders in these cases will affect all of the Debtors.

61.     Joint administration will also save time and money and avoid duplicative and potentially confusing filings by permitting counsel for all parties in interest to (a) use a single caption on the numerous documents that will be served and filed herein and (b) file the papers in one case rather than in both cases. Joint administration will also protect parties in interest by ensuring that parties in each of the Debtors' respective

Chapter 11 Cases will be apprised of the various matters before the Court in these cases. Finally, joint administration will ease the burden on the office of the United States Trustee in supervising these bankruptcy cases; provided, however, that all schedules of assets and liabilities, statements of financial affairs, and proofs of claim will be captioned and filed in each of the Debtors' respective, separate cases, as appropriate.

62.      The rights of the respective creditors and stakeholders of each of the Debtors will not be adversely affected by joint administration of these cases inasmuch as the relief sought is purely procedural and is in no way intended to affect substantive rights. Each creditor and other party in interest will maintain whatever rights it has against the particular estate in which it allegedly has a claim or right.

### B. Debtors' Motion for an Order Extending the Deadline to File Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules Extension Motion")

63.      In the Schedules Extension Motion, the Debtors request entry of an order extending the deadline by which the Debtors must file Schedules and Statements of Financial Affairs ("**SOFA**") by approximately fifteen (15) days in addition to the time limit provided by Fed. R. Bank. P. 1007(c), for a total of approximately twenty-nine days from the Petition Date.  Given the limited time and resources available to the Debtors to marshal the required information, an extension of the deadline to file the Schedules and SOFAs is necessary to ensure that the Debtors are able to attend to and manage the operation of their businesses and transition smoothly into chapter 11, with an appropriate amount of "breathing room" to compile, review, and file the Schedules and SOFAs.  This would be in the best interests of the Debtors, their estates, creditors, and

all parties in interest.  Accordingly, I respectfully submit that the Schedules Extension

Motion should be granted.

C. *Motion to Maintain Prepetition Bank Accounts and Cash Management System (the "Bank Accounts Motion")*

64.    Prior to the commencement of this case, in the ordinary course of

business, LSAR maintained a cash management system consisting of four (4) bank

accounts and Senior LS maintained one (1) bank account in order to effectively manage

their cash receipts and disbursements (collectively, the **"Bank Accounts"**).  Information

for these Bank Accounts is listed in the following chart:

| Bank | Account Name | Type of Account | Account No. (Last Four Digits) | Account Balance |
|------|-------------|----------------|-------------------------------|-----------------|
| Wells Fargo | LSAR Collection Account | Trust | 0500 | $7,918,322 |
| Wells Fargo | LSAR Payment Account | Trust | 0501 | $0.00 |
| Wells Fargo | LSAR Premium Reserve Account | Trust | 0502 | $353,214 |
| Wells Fargo | LSAR Litigation Account | Trust | 0504 | $20 |
| WSFS | Senior LS Christiana Trust Account | Trust | 1044 | $9,667 |

65.    The operation of the LSAR Collection Account, LSAR Payment Account,

LSAR Premium Reserve Account, and LSAR Litigation Account (collectively, the

"**Wells Fargo Bank Accounts**") is mandated and delineated in the Indenture.  All funds

held in the Wells Fargo Bank Accounts are held by Wells Fargo, as trustee under the

Indenture, and distributed by Wells Fargo in accordance with the Indenture and Policy

Administration Agreement.  Notably, the Debtors do not have signature authority on the

Wells Fargo Bank Accounts.  LSAR merely provides payment instructions to Wells

Fargo, who makes all disbursements and transfers between the Wells Fargo Bank Accounts in accordance with the Indenture and Policy Administration Agreement.

66.     Specifically, the Indenture requires LSAR to maintain the following Wells Fargo Bank Accounts to be used as follows:

    a.    Collection Account (Account 0500):  The Collection Account is LSAR's central account whereby all collections from the sale of the Policies, death benefits received from the Policies, and investment income is deposited.  Thereafter, funds from the Collection Account are transferred to the Premium Reserve Account (discussed below), and if additional funds are present, transferred to the Payment Account (discussed below).

    b.    Payment Account (Account 0501): Payments realized from the sale of the Policies, death benefits received from the Policies, and investment income are made to LSAR's creditors from funds available in the Payment Account.

    c.    Premium Reserve Account (Account 0502):  Annual premiums for LSAR's Policies are paid from the Premium Reserve Account.  LSAR is required to maintain two years in premium reserves to service premium payments for its Policies.

    d.    Litigation Account (Account 0504): The Litigation Account was initially established to make settlement payments related to litigation involving three insurance policies initially purchased by LSAR.  However, the Litigation Account is no longer used by LSAR and can be terminated and closed.

67.     Further, Senior LS maintains one (1) bank account which serves as a Policy sale escrow account as follows:

    a.    Christiana Trust Account (1044): When Policies are sold, escrowed purchase funds from the buyers are released to this account.  Fees and expenses related to the sale are paid from this account with the net proceeds remitted to LSAR's Collection Account, and then disbursed by Wells Fargo pursuant to the Indenture and Policy Administration Agreement.

68.     These Bank Accounts are collectively referred to as the Debtors' "**Cash Management System**."   All of the Bank Accounts are maintained with a depository authorized by the Office of the United States Trustee for Region 3.

69.     This Cash Management System permits the Debtors to accurately monitor cash availability at all times and to track and manage the collection and transfer of funds from a central position.

70.     The relief requested by the Bank Accounts Motion is appropriate because, given the complexity of the Debtors' business operations, a successful reorganization of the Debtors' businesses, as well as the preservation and enhancement of the Debtors' values as going concerns, simply cannot be achieved if the Debtors' Cash Management System is substantially disrupted and the Bank Accounts are closed.   For example, LSAR currently pays Premiums on the Policies as they accrue from time to time and on a rolling basis in any given month.   Any disruptions to those payments could result in the canceling of Policies and jeopardize the value of the Debtors' estates. Therefore, it is essential that the Debtors be permitted to continue its existing Bank Accounts and continue the operation of its business pursuant to its existing cash management procedures.

71.     It would be difficult, unduly burdensome and potentially devastating to the Debtors' estates to establish an entirely new system of Bank Accounts and a new cash management and disbursement system. Moreover, because the Debtors have the capability to draw the necessary distinctions between pre and postpetition obligations and payments without closing the prepetition Bank Accounts and opening new ones, the Debtors' creditors will not be prejudiced.

72.    Preserving "business as usual" and avoiding the unnecessary distractions that inevitably would be associated with any substantial disruption of the system of existing Bank Accounts will facilitate the Debtors' stabilization of their postpetition business operations and will assist the Debtors in their reorganization efforts. Thus, under the circumstances, the maintenance of the Bank Accounts not only is essential, but also is in the best interests of the Debtors' estates.

73.    In the ordinary course of its business, the Debtors use a multitude of checks and other business forms.  By virtue of the nature and scope of the Debtors' business operations, it is important that the Debtors be permitted to continue to use its existing checks and other business forms without alteration or change.

**D. Debtors' Motion for the Entry of an Order (a) Authorizing the Debtors' Interim and Final Use of Cash Collateral and (b) Authorizing, but not Requiring, the Debtors to Continue Paying All Insurance Premiums Paying Insurance Premiums and to Satisfy Certain Obligations In Respect of the Insurance Policies (the "_Cash Collateral Motion_")**

i.    Cash Collateral

74.    In order to meet the general rehabilitative purpose of chapter 11, which requires that debtors have the ability to access their cash to operate, the Debtors request authority to use the cash in the Bank Accounts.  For the reasons identified in the Cash Collateral Motion, the Debtors and their estates would suffer immediate and irreparable harm unless the Debtors are authorized to use Cash Collateral on the terms and conditions set forth in the Cash Collateral Motion and in accordance with the budget attached thereto.

75.    As discussed in the Cash Collateral Motion, the Debtors respectfully submit that the Secured Creditors are adequately protected because without the use of

the Bank Accounts, it is extremely unlikely that the Debtors can remain in business or that they will be able to successfully reorganize. If the Policy Payments are not paid, the Policies will lapse and the Secured Creditors will no longer have any source of repayment on their claims.  Thus, the Debtors must be required to preserve the value of the Policies if the Secured Creditors are to receive any payment on their claims.

ii.      Continued Payment of Insurance Premiums

76.      The Debtors' survival as going concerns is dependent on their ability to make pending Premium and servicing payments in relation to the Policies.  As set forth above, the Policies are LSAR's only significant assets and require Premiums on the Policies to be paid as they accrue from time to time and on a rolling basis in any given month.  The estimated cost of maintaining reserves for paying Premiums over the next two years is approximately $7.9 million.  Premiums are paid as cash is available. Typically, a given Policy is paid three months of its cost of insurance on a quarterly basis from its anniversary date.  Anniversary dates vary from Policy-to-Policy, which results in a staggered payment schedule throughout the year.  In addition, LSAR is required to pay certain servicing fees related to the Policies (the "**Policy Obligations**"). The Debtors seek authority to continue to pay all Premiums and Policy Obligations. Failure to pay the Premiums and Policy Obligations in a timely manner will cause the Policies to lapse, thus jeopardizing the primary assets of these estates, imperiling the Debtors' efforts to achieve their goals in these Chapter 11 Cases, and eliminating any potential for recovery to the Debtors' creditors.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury under the laws of the United States of American that the foregoing is true and correct.

By: _/s/ Robert J. Davey, III_
Robert J. Davey, III
Restructuring Manager for the Debtors