**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>LIFE SETTLEMENTS ABSOLUTE RETURN I, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 17-13030 (MFW)<br>(Jointly Administered)<br><br>**<u>Hearing Date</u>: 2/19/2019 @ 2:00 P.M. (ET)**<br>**<u>Obj. Deadline</u>: 2/12/2019 @ 4:00 P.M. (ET)** |

**MOTION PURSUANT TO 11 U.S.C. §§ 105, 363, 365, 503 AND 507 AND BANKRUPTCY RULES 2002, 6004 AND 6006 FOR (I) ENTRY OF AN ORDER (A) ESTABLISHING BID AND AUCTION PROCEDURES RELATED TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) APPROVING RELATED BID PROTECTIONS; (C) SCHEDULING AN AUCTION AND SALE HEARING; (D) ESTABLISHING CERTAIN NOTICE PROCEDURES FOR DETERMINING CURE AMOUNTS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE ASSUMED AND ASSIGNED; AND (E) GRANTING RELATED RELIEF; AND (II) ENTRY OF AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; AND (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN <u>EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>**

Life Settlements Absolute Return I, LLC ("**<u>LSAR</u>**") and Senior LS Holdings, LLC ("**<u>Senior LS</u>**," and collectively with LSAR, the "**<u>Debtors</u>**"), file this *Motion Pursuant to 11 U.S.C. §§ 105, 363, 365, 503 And 507 and Bankruptcy Rules 2002, 6004 and 6006 for (I) Entry of an Order (A) Establishing Bid and Auction Procedures Related to the Sale of Substantially All of the Debtors' Assets; (B) Approving Related Bid Protections; (C) Scheduling an Auction and Sale Hearing; (D) Establishing Certain Notice Procedures for Determining Cure*

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Life Settlements Absolute Return I, LLC (7992) and Senior LS Holdings, LLC (5731). The mailing address for the Debtors, solely for purposes of notices and communications, is: 6650 Rivers Avenue, Suite 105 #81921, North Charleston, SC 29406-4829, with copies to Nelson Mullins Riley & Scarborough LLP, c/o Shane G. Ramsey, 150 Fourth Avenue North, Suite 1100, Nashville, TN 37219 and Bayard, P.A., c/o Evan T. Miller, 600 N. King Street, Suite 400, Wilmington, DE 19801.

*Amounts for Executory Contracts and Unexpired Leases to be Assumed and Assigned; and (E) Granting Related Relief; and (II) Entry of an Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* (the "**Motion**"). In support of this Motion, the Debtors rely upon and fully incorporate the *Declaration of Robert J. Davey, III in Support of Chapter 11 Petitions and First Day Motions* [D.I. 7] (the "**First Day Declaration**")[2]. In further support of the Motion, the Debtors respectfully represent as follows:

**RELIEF REQUESTED**

1.      By this Motion, the Debtors respectfully request the entry of orders substantially in the form of **Exhibit A**, (the "**Bid Procedures Order**"), and **Exhibit B** (the "**Sale Order**"): (a) establishing bidding procedures for the sale of Debtors' assets, approving the proposed bid protections, scheduling the auction and establishing notice procedures for the assumption and assignment of executory contracts and unexpired leases; (b) approving the sale of substantially all of the Debtors' assets free and clear of all liens, claims, encumbrances and interests; and (c) authorizing the assumption and assignment of certain executory contracts and unexpired leases, all in accordance with that certain Purchase and Sale Agreement attached as **Exhibit C** (the "**Purchase and Sale Agreement**").

---

[2] Unless otherwise defined herein, capitalized terms shall have the meaning ascribed to them in the First Day Declaration. Further, any terms (whether capitalized or lower case) used herein that are defined in the Uniform Commercial Code (the "**UCC**") shall be construed and defined as set forth in the UCC unless otherwise defined herein; provided that to the extent that the UCC is used to define any term used herein and if such term is defined differently in different articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

3. Venue of this case is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

4. Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

5. The statutory predicates for the relief requested in this Motion are 11 U.S.C. §§ 105, 363, 365, 503 and 507 as complemented by Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 6004-1(c) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

## BACKGROUND

6. On December 29, 2017 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned bankruptcy cases (collectively, the "**Chapter 11 Cases**"). On the same day, the Debtors filed a motion directing joint administration of the Chapter 11 Cases. On January 5, 2018, the Court entered an order directing the joint administration of the Chapter 11 Cases [D.I. 25].

7. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors in-possession. To

date, no official committees have been appointed in these Chapter 11 Cases and no request has been made for the appointment of a trustee or an examiner.

8. The history of the Debtors and the events giving rise to these Chapter 11 Cases are fully set forth in the First Day Declaration. As more fully set forth therein, LSAR was formed as a special purpose vehicle to invest in life insurance policies (the "**Policies**") in the life settlement market. The Policies were issued by leading insurance companies to individuals who are generally wealthy and desire to sell their Policies and the related benefits, rather than surrender them to the issuing insurance company for less value (the "**Insureds**"). Upon purchasing a policy, the investor maintains such policy by paying the premiums and any related costs (collectively, the "**Premiums**") until the insured individual passes away. At such time, the investor, as the owner and beneficiary of the policy, is entitled to the death benefit proceeds.

9. Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the filing of these Chapter 11 Cases is set forth in the First Day Declaration.

## A. Summary of the Debtors' Prepetition Indebtedness[3]

10. As discussed more fully in the First Day Declaration, pursuant to the Indenture, in 2008 LSAR issued Preference Notes in the principal amount of $40 million, Mezzanine Notes in the principal amount of $24 million, and Residual Notes in the amount of $110,222,499 (collectively, the "**2008 Notes**").

11. The Indenture further authorized LSAR to incur credit pursuant to a credit facility in a principal amount not to exceed $15 million.

[3] The below summary of the Debtors' Prepetition Collateral structure is intended for informational purposes only and shall not constitute a finding as to the validity of any indebtedness of the Debtors nor prohibit any party, including, without limitation, the Debtors, from challenging any aspect of such financing.

12. Pursuant to the Indenture, LSAR pledged, among other things, the Policies and the proceeds thereof to Wells Fargo to secure payment of the 2008 Notes and any properly issued credit facility.

13. On July 11, 2012, LSAR and GERS formally documented an Amended and Restated Loan Agreement (the "**Purported Credit Facility**").

14. GERS asserts a first priority secured claim in the amount of $14,527,076.69 for advances made under the Purported Credit Facility [Claim Register No. 3-1] (the "**GERS Claim**"). The GERS Claim is purportedly secured by substantially all of the assets of the Debtors (the "**Alleged Collateral**") by virtue of the Purported Credit Facility and the Indenture.

15. Pursuant to the Indenture, Wells Fargo, as Indenture Trustee under the Indenture, is the collateral agent with respect to the holders of the 2008 Notes and, as such, has an interest in the Policies and proceeds thereof pledged to secure the obligations due and owing under the 2008 Notes.

16. GERS contends that the Purported Credit Facility is likewise secured by the Policies and proceeds thereof. The Debtors dispute this contention.

17. This dispute between the Debtors and GERS is currently being litigated in Adversary Proceeding Number 18-50677 (MFW) (the "**Litigation**").

## B. Background Regarding Sale

18. Shortly after the Petition Date, the Debtors contacted multiple parties, and were contacted by multiple parties, who were or might be interested in providing a debtor-in-possession loan to the Debtors or purchasing the Debtors assets.

19. This marketing process led to the execution of 20 non-disclosure agreements ("**NDAs**") with well-known funds, including some of the leading names in the life settlements industry (the "**NDA Parties**").

20.    Over the course of approximately the next ten months, the NDA Parties conducted due diligence regarding the Debtors' businesses.

21.    On January 18, 2018, one of the NDA Parties made an offer to purchase the Policies for $2 million. The Debtors did not believe this offer represented a fair price for the Policies and, consistent with their fiduciary duties, rejected the offer.

22.    No other NDA Parties made an offer to purchase the Policies.

23.    Several NDA Parties expressed an interest in providing debtor-in-possession financing ("**DIP Financing**") to the Debtors.

24.    After negotiating with multiple parties, the Debtors executed a term sheet dated March 30, 2018 with one of the NDA Parties regarding DIP Financing.

25.    From March 2018 through November 2018, the Debtors negotiated a formal agreement with this NDA Party for the provision of DIP Financing.  However, Ensign Peak Advisors, Inc. ("**Ensign Peak**"), the holders of the Debtors' Preference Notes, has advised the Debtors that it will contest the Debtors obtaining DIP Financing, or any other form of financing, on a basis that will prime its lien.

26.    Ensign Peak has not offered to provide DIP Financing or other financing to the Debtors.

27.    In November 2018, the Debtors were approached by an entity regarding a potential offer to purchase the Policies for $5.1 million.  However, the Debtors did not enter into a formal purchase agreement with that entity.

28.    On November 23, 2018, the Debtors notified all of the NDA Parties that they had received a proposal to purchase the Policies and invited the NDA Parties to submit competing

offers. Five of the NDA Parties expressed interest in submitting a competing offer, but to date, no other NDA Party has submitted a competing offer.

29. In December 2018, the Debtors were approached by BPCP Life Settlement LLC ("**BPCP**" or the "**Stalking Horse**") regarding a potential offer to purchase the Policies.

30. As a result of the feedback the Debtors received from Ensign Peak regarding the proposed DIP Financing, the Debtors determined that, consistent with their fiduciary duties, they should engage BPCP in negotiations regarding a potential sale of the Policies.

31. On January 29, 2019, BPCP made a formal Stalking Horse proposal to purchase the Policies.

32. Ultimately, the Debtors and their professionals, in consultation with certain of its pre-petition creditors, collectively determined that the proposal submitted by BPCP, and the continued marketing process to be completed as part of the Chapter 11 Cases, would maximize the financial return to the Debtors' creditor constituencies with minimal closing risk. BPCP has entered into a stalking horse purchase and sale agreement with the Debtors. By this Motion, the Debtors seek an order from the Bankruptcy Court approving BPCP as the stalking horse bidder and a corresponding marketing process that would culminate in an auction designed to maximize the sales price for the Debtors' assets.

## C. Proposed Timeline for Sale of Property

33. The Debtors propose the following timeline (the "**Timeline**") for the sale process:

| **Event** | **Deadline** |
|---|---|
| Bid Procedures Hearing……………….…...... | February 19, 2019 |
| Proposed Bid Deadline …………………….. | [45 days after entry of Bid Procedures Order] |
| Auction……………………………………… | [3 business days after Bid Deadline] |

{BAY:03428702v4}

| **Event** | **Deadline** |
|---|---|
| Sale Hearing………………………….…….... | [3 business days after Auction] |
| Closing ……………………………………… | [3 business days after entry of Sale Order] |

34. Given their post-petition marketing efforts, the Debtors believe that the proposed timeline is more than sufficient to complete a fair and open sale process and maximize the value received for the assets to be acquired pursuant to the Sale and Purchase Agreement (the "**Property**"). The Timeline will provide the Debtors sufficient time to solicit (and/or re-solicit) prospective purchasers in advance of the Proposed Bid Deadline set forth in the Timeline, while respecting the necessity to consummate a sale as quickly as possible to maximize the net value obtained for the Debtors' Property for the benefit of their estates and all constituencies.

## D. No Collusion

35. Debtors engaged in extensive negotiations with the Stalking Horse, which produced the Purchase and Sale Agreement. The negotiations regarding price, as well as the other terms of the agreement, were conducted at arms-length. *Boyer v. Gildea*, 374 B.R. 645, 658 (N.D. Ind. 2007). Moreover, the Debtors certify that neither they nor the Stalking Horse engaged in any type of collusive activity to control the sales price with Stalking Horse or any other party. The Bid Procedures also require each Qualified Bidder participating in the Auction to confirm that it has not engaged in any collusion with respect to the bidding. Thus, section 363(n) of the Bankruptcy Code governing collusive sales is inapplicable to the proposed Purchase and Sale Agreement and the transactions contemplated therein. 11 U.S.C. § 363 (n).

## E. Terms of the Purchase and Sale Agreement

36. A summary of the pertinent terms of the Purchase and Sale Agreement, including the terms to be highlighted pursuant to Local Rule 6004-1, is as follows:[4]

- Property: Section 2.01 of the Purchase and Sale Agreement lists the Property to be acquired by the Stalking Horse. As set forth therein, the Stalking Horse will acquire substantially all of the Debtors' assets, including all of the Life Settlement Policies;

- Buyer's Assumed Obligations: As set forth in Section 2.01(c) of the Purchase and Sale Agreement, the liabilities to be assumed by the Stalking Horse include the Executory Contract;

- Purchase Price: Section 1.01 and 2.03 of the Purchase and Sale Agreement provides that the Purchase Price for the Purchased Property will be $5,650,000;

- Payment of Premiums: Section 1.01 of the Purchase and Sale Agreement provides that the Premiums of each of the Life Settlement Policies shall be paid by the Debtors through a date not earlier than nine (9) months after the Closing Date;

- Termination and Other Deadlines: Section 9.01 of the Purchase and Sale Agreement sets forth circumstances under which the Purchase and Sale Agreement may be terminated;

- Break-Up Fee, Stalking Horse Expense Reimbursement Amount and Minimum Overbid Amount: Section 6.01(b) of the Purchase and Sale Agreement and paragraph 7 of the Bid Procedures Order contemplate a Break-Up Fee of three percent (3.5%) of the of the ultimate winning bid for the Property, plus documented, out-of-pocket expenses of the Stalking Horse, including documented legal fees and costs of Stalking Horse in the aggregate amount not to exceed $350,000. The first competing bid shall be in the sum of $547,750 over and above the Purchase Price, with subsequent incremental bids in the minimum amount of $200,000;

- Closing Conditions. The respective obligations of the Stalking Horse and the Debtors to consummate the closing of the transactions contemplated by the Purchase and Sale Agreement are subject to the satisfaction or waiver of the closing conditions set forth in Article VII of the Purchase and Sale Agreement;

- Performance Deposit. Pursuant to Section 2.02 of the Purchase and Sale Agreement, the Stalking Horse is required to deposit $250,000 with Debtors upon entry of the Bid Procedures Order;

---

[4] The following summary is qualified in its entirety by reference to the provisions of the Purchase and Sale Agreement. In the event of any inconsistencies between the provisions of the Purchase and Sale Agreement and the terms herein, the terms of the Purchase and Sale Agreement shall control.

- Sale Free and Clear: The Sale Order provides that on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, liabilities and encumbrances of, against or created by Debtors or their bankruptcy estates, will be fully released from and with respect to the Property, which shall be transferred to the Stalking Horse free and clear of all obligations, liabilities and encumbrances except for the Stalking Horse's assumption of the Executory Contracts. The Sale Motion will be deemed to provide sufficient notice as to the sale and assignment of the Property free and clear of all Liens in accordance with Local Rule 6004-1. Following the Closing, no holder of any Lien on the Property may interfere with the Stalking Horse's use and enjoyment of the Property based on or related to such Lien, or any actions that the Debtors may take in their chapter 11 cases and no interested party may take any action to prevent, interfere with or otherwise enjoin consummation of the Sale or by this Order;

- No Successor Liability: The Sale Order provides that the Stalking Horse and its Affiliates and their respective predecessors, successors, assigns, members, partners, principals, directors, officers, and shareholders (or equivalent) have no obligations with respect to any liabilities of the Debtors other than the Stalking Horse's obligations assumed under or pursuant to the Purchase and Sale Agreement; and

- Relief From Bankruptcy Rule 6004(h): The Sale Order provides that the Sale Order will be effective and enforceable immediately upon entry and its provisions will be self-executing.

- Assumption of Executory Contract. The Stalking Horse intends to assume the servicing agreement with Clear View Advisors Corporation ("**CVACorp**") for the servicing of the Life Settlement Policies. As stated in the *Declaration of Robert J. Davey, III in Support of Motion of Debtors for Order Authorizing Employment, Retention, and Compensation of Clear View Advisors Corporation as the Contractor to the Equity Representative in the Ordinary Course of Business Pursuant to 11 U.S.C. §327(b), Nunc Pro Tunc to the Petition Date* [D.I. 12], Robert J. Davey, III is the owner of CVACorp, is the Secretary/Treasurer of The Attilanus Fund I, L.P. ("**Attilanus**"), which is the sole member of LSAR, and is the Secretary/Treasurer of Anysia Financial Management, LLC, which conducts and manages the business of Attilanus.

37. Finally, the Purchase and Sale Agreement contemplates a going concern sale, with a certain designated executory contract to be assumed and assigned to the Stalking Horse on the Closing Date.

## BASIS FOR RELIEF REQUESTED

### A. Necessity for Sale

38. After critical analysis, the Debtors concluded that their forecasted revenues would be insufficient to adequately fund the Debtors' business operations, the costs to service the Premiums, and debt service obligations. Thus, the Debtors, in consultation with their professional advisors, determined that given their leveraged financial position, their diminishing revenue stream, and their conclusions about the valuation of the Debtors' businesses and assets, the most effective way to preserve the Debtors' going concern value for the benefit of all constituencies would be a sale of their assets following a thorough marketing process.

39. The Debtors submit that a Sale of the Property along the Timeline will adequately address their liquidity issues by transferring ownership of the business to a financially stable buyer, with the ability to satisfy the capital requirements of the business so that the business can continue on a going concern basis, while maximizing the value of the Debtors' estates for the benefit of all constituencies. Accordingly, the Debtors have decided to pursue the Sale of the Property, and they assert that they must be permitted to conduct the process in the manner proposed in the Bid Procedures. In the absence of a sale transaction conducted in accordance with such timeline, the Debtors may not have sufficient liquidity to maintain operations going forward, will likely face deterioration in the value of the business and may be unable to continue operations, potentially leading to liquidation under Chapter 7 of the Bankruptcy Code.

### B. Bid Procedures[5]

40. To maximize the value of the Property for the benefit of the Debtors' and their estates and all parties in interest, the Debtors seek to implement a competitive bidding process

[5] Terms used but not otherwise defined in this section of this Motion shall have the meanings ascribed to them in the Bid Procedures attached as **Schedule 1** to the Bid Procedures Order.

designed to generate maximum net value. As described more fully in the Bid Procedures attached as **Schedule 1** to the Bid Procedures Order attached to this Motion as **Exhibit A**, the Debtors propose selling the Property to a Qualified Bidder making the highest or best offer for the Property.

41. As described more fully in the Bid Procedures, the Debtors propose a process governed by the following procedures:[6]

Bid Deadline. Any party interested in submitting a bid must transmit such bid to the parties identified on **Schedule 1** attached to the Bid Procedures not later than 5:00 p.m. (prevailing Eastern Time) on the date that is 45 days after entry by the Court of a Bid Procedures Order (the "**Bid Deadline**");

Required Bid Materials. All bids, other than that of the Stalking Horse, must include the following, among other things (the "**Required Bid Materials**"):

a) Identification of Potential Bidder. Identification of the party submitting the bid (the "**Potential Bidder**") (and any equity holders, in the case of a Potential Bidder which is an entity specially formed for the purpose of effectuating the contemplated transaction) and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction;

b) Purchase and Sale Agreement. An executed copy of a purchase and sale agreement providing for the purchase of the assets of the Debtors. Such purchase and sale agreement shall be substantially in the form of the Purchase and Sale Agreement and delivered together with a draft marked against the Purchase and Sale Agreement to reflect all variations from the Purchase and Sale Agreement;

c) Financing. Evidence of the Potential Bidder's ability to consummate the transaction and payment of the purchase price in cash at the Closing, including, but not limited to:

i. a signed commitment for any debt or equity financing;

---

[6] The following description of the Bid Procedures is only a summary of the terms set forth in the Bid Procedures attached as **Schedule 1** to the Bid Procedures Order. The following summary is qualified in its entirety by reference to the provisions of the Bid Procedures. In the event of any inconsistencies between the provisions of the Bid Procedures and the terms herein, the terms of the Bid Procedures shall control.

    ii. a bank or other account statement showing the ability of a Potential Bidder to pay cash for the Property;

iii. contact names and numbers for verification of financing sources; and

iv. current audited financial statements (or such other form of financial disclosure and credit-quality support or enhancement, acceptable to the Debtors), of the Potential Bidder or those entities that will guarantee in full the payment obligations of the Potential Bidder;

d) Initial Overbid Amount and Bid Increments. At any Auction, the minimum initial overbid (the "**Initial Overbid**") shall be a sum that results in value to the Debtors' estates that is at least $547,750 in excess of the Purchase Price. Subsequent bids shall be in increments of at least $200,000.

e) Irrevocability of Bid. A letter stating that the Potential Bidder's offer is irrevocable until the first business day after the Property for which the Potential Bidder is submitting a bid has been sold pursuant to the closing of a sale or sales approved by the Bankruptcy Court;

f) Performance Deposit. A cash deposit equal to ten percent (10%) of the Potential Bidder's bid, by wire transfer, certified or cashier's check, as a deposit that will constitute liquidated damages if the Potential Bidder shall default with respect to its offer;

g) Identification of Executory Contract. The bid shall identify with particularity the Debtors' executory contracts with respect to which the Potential Bidder seeks to receive an assignment and any designation rights it seeks;

h) No Financing or Diligence Constituencies. The bid shall not contain any due diligence, financing or regulatory contingencies of any kind, though the bid may be subject to the satisfaction of specific conditions in all material respects at Closing;

i) Consent to Jurisdiction and Authority to Enter Final Orders. The bid shall state that the offering party consents to the jurisdiction of the Bankruptcy Court and to the entry of a final judgment or order with respect to the Potential Bidder's offer, as well as with respect to any aspect of this Motion, including the Bid Procedures, and all orders of the Bankruptcy Court entered with respect to the Sale, if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties;

j) Corporate Authority. The bid shall include evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the submitted purchase and sale agreement of the Potential Bidder; and

k) Adequate Assurance Information. The bid shall include sufficient financial or other information (the "**Adequate Assurance Information**") to establish adequate assurance of future performance with respect to any lease or contract to be assumed and assigned to the Potential Bidder in connection with the proposed transaction. The bid shall also identify a contact person (with relevant contact information) that counterparties to any lease or contract can contact to obtain additional Adequate Assurance Information

In addition, the bid must satisfy the other requirements set forth under "Bid Requirements" in the Bid Procedures.

A "**Qualified Bidder**" is a Potential Bidder that delivers the documents described in subparagraphs (a)-(k) above, and that the Debtors determine is reasonably likely (based on financial information submitted by the Potential Bidder, the availability of financing, experience and other consideration deemed relevant by the Debtors) to be able to consummate a sale if selected as the Prevailing Purchaser. Notwithstanding the foregoing, the Stalking Horse shall be deemed a Qualified Bidder. Not later than two (2) business days after a Potential Bidder delivers all of the materials required by subparagraphs (a)–(k) above, the Debtors shall determine and shall notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder. A bid from a Qualified Bidder is a "**Qualified Bid**."

Auction. If a Qualified Bid, other than that submitted by the Stalking Horse, has been received by the Debtors, the Debtors may conduct an auction (the "**Auction**") with respect to all or some of the Property. The Auction shall be conducted at the offices of Nelson Mullins Riley & Scarborough LLP, 104 South Main Street, Suite 900, Greenville, SC 29601 (the "**Auction Site**"), at a date and time determined by the Bankruptcy Court (the "**Auction Date**"), or such other place and time as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids and expressed their intent to participate in the Auction as set forth above. As the GERS Claim is currently subject to a bona fide dispute in the Litigation, GERS shall not be entitled to offset its secured claim against the purchase price of the Property pursuant to 11 U.S.C. § 363(k). Any and all liens against the Property shall attach to the proceeds of the Sale.

**C. Break-Up Fee and Expense Reimbursement**

42. To provide an incentive and to compensate the Stalking Horse for entering into the Purchase and Sale Agreement, the Debtors have agreed to the Bid Protections, including the Break-Up Fee and Expense Reimbursement.

43. The Debtors believe that offering the Bid Protections to the Stalking Horse will provide a post-petition benefit to the Debtors' estates by establishing a floor and promoting more competitive bidding. The availability of the Bid Protections is necessary to provide the Stalking Horse with some assurance that it will be compensated for the time and expense it has spent in putting together its offer for the Property and the risk that arises from participating in the bidding and subsequent Auction process. Moreover, the Stalking Horse has required the Break-Up Fee and Expense Reimbursement as a condition to its bid pursuant to the Purchase and Sale Agreement.

**D. Notice of Bid Procedures, Auction and Sale**

**i. Notice of Sale Hearing**

44. Upon the entry of the Bid Procedures Order, the Debtors shall serve this Motion and all exhibits to the Motion, by first-class mail, postage prepaid, upon (a) the United States Trustee for the District of Delaware; (b) Wells Fargo, as Indenture Trustee; (c) the creditors listed on the Debtors' consolidated list of 25 largest unsecured creditors, as filed with the Debtors' chapter 11 petitions; (d) counsel to the Stalking Horse; (e) all parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors; (f) federal, state, county and city tax and regulatory authorities to which the Debtors are subject, to the extent reasonably known to the Debtors; (g) all entities known to have expressed an interest in a transaction with respect to the Property or that have been identified by the Debtors

or their advisors as a Potential Bidder of the Property; and (h) all parties requesting notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Sale Notice Parties**").

**ii.     Notice of Sale**

45.    Within five (5) business days of the entry of the Bid Procedures Order (the "**Mailing Date**") or as soon thereafter as practicable, the Debtors shall serve upon the Sale Notice Parties by first-class mail, postage prepaid, a sale notice (the "**Notice of Auction and Sale Hearing**") substantially in the form attached to the Bid Procedures Order as **Schedule 2**, setting forth the dates established for submission of Qualified Bids, the Auction and the Sale Hearing.

**iii.    Post-Auction Notice**

46.    As soon as possible after the conclusion of the Auction, the Debtors shall file, but not serve, a notice (the "**Post Auction Notice**") identifying any successful bidder (the "**Prevailing Purchaser**").

**E.    Cure Procedures**

47.    The Debtors propose the following procedures (the "**Cure Procedures**") for notifying counterparties to executory contracts and unexpired leases of potential Cure Amounts (as defined below) with respect to those executory contracts and unexpired leases that the Debtors may seek to assume and assign on the Closing Date.

48.    Within five (5) business days of the entry of the Bid Procedures Order, the Debtors will file a notice of potential assumption, assignment and/or transfer of the executory contract listed therein (the "**Designated Executory Contract**"), substantially in the form attached to the Bid Procedures Order as **Schedule 3** (the "**Notice of Assumption and Assignment**") and serve such notice on all non-debtor parties to the Designated Executory Contract (the "**Contract Notice Parties**").

49.     The Notice of Assumption and Assignment shall identify whether an individual Designated Executory Contract is a part of the Sale and the amount reflected in the Debtors' records with respect to each such agreement necessary to cure monetary defaults under each such Designated Executory Contract (the "**Cure Amounts**") as of such date (the "**Cure Date**"). Additionally, the Notice of Assumption and Assignment shall explain how a non-debtor party to an executory contract or unexpired lease may obtain "adequate assurance of future performance" information from the Stalking Horse (the "**Proposed Purchaser Adequate Assurance Information**").  The Notice of Assumption and Assignment shall set a deadline by which the non-debtor party may file an objection to the Cure Amount or the Proposed Purchaser Adequate Assurance Information.  The Debtors request that this Court schedule the deadline to object to any Cure Amount or to the Proposed Purchaser Adequate Assurance Information as fifteen (15) calendar days after service of the Notice of Assumption and Assignment.  The Debtors shall have the ability to file an amended Notice of Assumption and Assignment: (a) identifying additional executory contracts or unexpired leases that might be assumed by the Debtors and assigned to the Stalking Horse not set forth in the original Notice of Assumption and Assignment, (b) identifying executory contracts or unexpired leases that are removed from the original Notice of Assumption and Assignment, or (c) setting forth amended Cure Amounts.  The Debtors propose that any parties affected by an amended Notice of Assumption and Assignment be provided fifteen (15) calendar days, after service of the amended Notice of Assumption and Assignment, to object to the Cure Amount described in the amended notice. Moreover, the Notice of Assumption and Assignment, and any amended notice, shall provide that objections to any Cure Amount or to the Proposed Purchaser Adequate Assurance Information will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors in consultation with the Court.  In the

event that the Prevailing Purchaser is not the Stalking Horse, the Debtors propose that any objections regarding "adequate assurance of future performance" may be raised at the Sale Hearing.

50.    The Debtors or the Prevailing Purchaser may determine to exclude any Designated Executory Contract (an "**Excluded Contract**") no later than three (3) business days prior to the Sale Hearing.  The non-debtor party or parties to any such Excluded Contract will be notified of such exclusion by written notice mailed no later than the day that is one (1) Business Day after a Final Order determining the actions necessary to Cure or any request for adequate assurance of future performance.

51.    At the Sale Hearing, the Debtors shall (a) present evidence necessary to demonstrate adequate assurance of future performance by the Prevailing Purchaser, and (b) request entry of an order requesting approval of the assumption and assignment of any or all executory contracts and unexpired leases to be assumed and assigned on the Closing Date to the Prevailing Purchaser.  For the foregoing reasons, the Debtors believe that granting the relief requested in this Motion is appropriate and in the best interests of all constituencies.

## APPLICABLE AUTHORITY

52.    "Under Delaware law, the business judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'" *Continuing Creditors' Committee of Star Telecomms., Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 462 (D. Del. 2004) (quoting *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988)); *see also Ad Hoc Committee of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 555 n.111 (D. Del. 2008).  Thus, this Court should grant the relief requested in this Motion if the Debtors

demonstrate a sound business justification therefor. *See In re Del. Hudson Ry. Co.*, 124 B.R. 169, 179 (Bankr. D. Del. 1991).

53. As discussed above and below, the Debtors have sound business justifications for selling the Property at this time. After critical analysis, the Debtors concluded that their forecasted revenues were insufficient to adequately fund the Debtors' business operations, service the Premium payments, and pay their debt service requirements. Thus, following consultation with their advisors, the Debtors determined that, given their overly leveraged financial position and their conclusions about the valuation of the Debtors' business, the most effective way to preserve the Debtors' going concern value for the benefit of creditors was through a sale of the Debtors' assets following a thorough marketing process. A sale of the Debtors' assets will result in the transfer of the business on a going concern basis to a financially stable buyer that will be able to satisfy the going-forward capital requirements. Accordingly, the Debtors submit that the proposed sale will enable them to address their liquidity issues. Until these issues are addressed, however, the Debtors believe that the value of the business could erode. Accordingly, a sale consistent with the timeframe proposed herein is necessary to maximize the value of the Debtors' assets for the benefit of all constituencies in these Chapter 11 Cases.

## A. <u>The Bid Procedures are Fair and are Designed to Maximize the Value Received for the Property</u>.

54. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The Debtors are confident that the Bid Procedures are appropriate under sections 105 and 363 of the Bankruptcy Code, will ensure that the bidding process is fair and reasonable, and will yield the maximum value for the estates and creditors. The Bid Procedures provide Potential Bidders with sufficient notice and an opportunity to acquire

{BAY:03428702v4}

information necessary to submit a timely and informed bid. The Bid Procedures proposed herein are designed to maximize the value received for the Property by facilitating a competitive bidding process in which all Potential Bidders are encouraged to participate and submit competing bids. The Bid Procedures will provide the Debtors with the opportunity to consider all competing offers and to select the highest or best offer for the sale of substantially all of the Property.

55. The Debtors request this Court's approval of the Bid Procedures, including the dates established thereby for an Auction and a Sale Hearing. Accordingly, the Debtors and all parties-in-interest can be assured that the consideration for the Property will be fair and reasonable, and there are sound business reasons to approve the Bid Procedures.

**B. The Bid Protections Are Necessary to Preserve the Value of the Debtors' Estates.**

56. Pursuant to Bankruptcy Rule 6004(f)(1), a sale of property outside the ordinary course of business may be by private sale or by public auction. The Debtors believe that having the ability to offer the Bid Protections to the Stalking Horse and conduct an Auction will likely maximize the realizable value of the Property for the benefit of the Debtors' estates, creditors and other parties-in-interest.

57. Approval of the Bid Protections to the Stalking Horse is governed by standards for determining the appropriateness of bid protections in the bankruptcy context. Courts have identified at least two instances in which bid protections may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Reliant Energy Channelview LP v. Kelson Channelview LLC*, 594 F.3d 200, 206-07 (3d Cir. 2010). Second, if the availability of break-up fees and expense reimbursements were

to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. *Reliant,* 594 F.3d at 206-07; *O'Brien*, 181 F.3d at 537.

58. The Break-Up Fee and Expense Reimbursement set forth in the Bid Procedures will enable the Debtors to secure an adequate floor for the Property and to therefore insist that competing bids be materially higher or otherwise better than the Purchase and Sale Agreement — a clear benefit to the Debtors' estates. Moreover, the Stalking Horse would not agree to act as a stalking horse without the protections of the Break-Up Fee and Expense Reimbursement. Without the Break-Up Fee and Expense Reimbursement, the Debtors might lose the opportunity to obtain the highest or best offer for the Property and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse and the Purchase and Sale Agreement which is conditioned upon the approval of the Break-Up Fee and Expense Reimbursement. Furthermore, without the benefit of the Stalking Horse, the bids received at Auction for the Property could be substantially lower than that offered by the Stalking Horse.

59. "The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable." *The Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 660 (S.D.N.Y. 1992). As is customary, the Bid Protections are compensation for the Stalking Horse's investment of considerable time and expense in negotiating and entering into the Purchase and Sale Agreement. The Debtors do not believe the Bid Protections will stifle bidding. To the contrary, the Debtors believe that, should an auction be held, the Bid Protections will encourage bidding by serving "any of three possible useful functions: (1) to attract or retain a potentially

{BAY:03428702v4}

successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders." *Id.* at 662. If the Property is sold to a competing bidder, the sale likely will be the result of Stalking Horse's crucial role as an initial bidder generating interest in the Property and establishing a minimum acceptable price and offer against which other parties can bid.

60. In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." *Id*; *see also Integrated Res.*, 147 B.R. at 662 (breakup fee of up to 3.2%, plus reimbursement of expenses, found to be reasonable).

61. Here, the Break-Up Fee is equal to 3.5% of the aggregate Purchase Price and the Expense Reimbursement is limited documented, out-of-pocket expenses of the Stalking Horse, including documented legal fees and costs not to exceed $350,000. Together, such amounts are consistent with the range of bid protections typically paid in sale transactions that have been approved by this Court. Given the size of the Purchase Price, the Debtors believe the amount of the Bid Protections is appropriate.

**C. <u>Approval of the Sale is Warranted Under Bankruptcy Code 363(b).</u>**

62. Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts in this district and elsewhere have found that a debtor's sale or use of assets outside the ordinary course of business should be approved if the debtor can

demonstrate a sound business justification for the proposed transaction. *See, e.g., In re Eagle Picher Holdings, Inc.*, 2005 Bankr. LEXIS 2894, at ¶ 3 (Bankr. S.D. Ohio 2005); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983). Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bonier. N.D. Ill. 1995); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions").

63. The sale of a debtor's assets is appropriate where there are sound business reasons behind such a determination. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *see also Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (Bankr. D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986) (sale of substantially all assets of estate authorized where "a sound business purpose dictates such action").

64. The Debtors have a sound business justification for selling the Property at this time. Based on a careful review of the Debtors' liquidity constraints and their ongoing and future business prospects, the Debtors' management and team of financial advisors have concluded that an expedited Sale of all of the Property in accordance with the procedures set forth in the Bid Procedures is the best method to maximize recoveries to the estates. Maximization of the Property value is a sound business purpose warranting authorization of any

proposed Sale. For the reasons discussed herein, the Debtors believe that an expedited sale of the Property is the best way to maximize value for the benefit of creditors and stem any further deterioration of the going concern value of the company.

65. The Debtors have proposed a fair and open process for achieving the objective of obtaining the highest or best offer and sale of their assets for the benefit of the Debtors' estates and their creditors. The Sale of the Property will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Property. Consequently, the fairness and reasonableness of the consideration to be received by the Debtors will ultimately be demonstrated by a "market check" through the auction process, which is the best means for establishing whether a fair and reasonable price is being paid.

66. For the reasons outlined above, the Debtors assert that their entry into the Purchase and Sale Agreement and other ancillary documents is a sound exercise of their business judgment and supported by the facts and circumstances of these Chapter 11 Cases.

67. In addition, all creditors and parties-in-interest will receive adequate notice of the Bid Procedures and Sale Hearing, as set forth above. Such notice is reasonably calculated to provide timely and adequate notice to the Debtors' major creditor constituencies, those parties most interested in these Chapter 11 Cases, those parties potentially interested in bidding on the Property and others whose interests are potentially implicated by a proposed Sale. Accordingly, consummating the Sale as soon as possible is in the best interests of the Debtors and their creditors and parties-in-interest.

**D. The Proposed Sale Satisfies the Requirements of Section 363(f) for a Sale Free and Clear of Interests.**

68. Section 363(f) of the Bankruptcy Code permits the Debtors to sell assets free and clear of all liens, claims, interests, charges, and encumbrances (with any such liens, claims,

interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets). As section 363(f) of the Bankruptcy Code is stated in the disjunctive, when proceeding pursuant to section 363(b), it is only necessary to meet one of the five conditions of section 363(f). *Citicorp Homeowners Servs., Inc. v. Elliot*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (stating that section 363(f) of the Bankruptcy Code is written in the disjunctive; holding that if any of the five conditions of section 363(f) are met, the trustee has the authority to conduct the sale free and clear of all liens). The Debtors believe that they will be able to demonstrate at the Sale Hearing that they have satisfied one or more of these conditions.

69.     The asserted lien represented by the GERS Claim is subject to a bona fide dispute in the Litigation, and the sale of the Property free and clear of its asserted lien is proper under section 363(f)(4).

70.     The Debtors believe that the holders of the 2008 Notes will consent to the sale free and clear under section 363(f)(2). In the event they do not, a sale free and clear can proceed pursuant to section 363(f)(5) of the Bankruptcy Code because the holders of the 2008 Notes will be paid from the proceeds of the Sale and the Debtors will establish at the Sale Hearing that the holders of the 2008 Notes can be compelled to accept a monetary satisfaction of their claims.

71.     The Debtors propose that any bona fide and allowed claims or interests shall attach to the Sale proceeds with the same force, validity, effect, priority and enforceability as such Interests had in the Property prior to such Sale.

**E.      The Purchaser Should be Entitled to the Protections of Section 363(m).**

72.     Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *See In re Abbotts Dairies*, 788 F.2d at 147; *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain V. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985).

73. The Purchase and Sale Agreement was negotiated at arm's length, with all parties represented by their own counsel. Additionally, the Debtors will adduce facts at the Sale Hearing demonstrating that any bidder who is deemed the Prevailing Purchaser for all of the Property had negotiated at arm's length, with all parties represented by their own counsel.

74. Accordingly, the Sale Order will include a provision that the Prevailing Purchaser for the Property, is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code. The Debtors believe that providing the Prevailing Purchaser with such protection will ensure that the maximum price will be received by the Debtors for the Property and that closing of the Sale will occur promptly.

**F. The Assumption and Assignment of Executory Contracts and Unexpired Leases**

75. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See e.g., In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *See Grp. of Institutional Inv'rs v. Chi. M. St. P. & P.R.R. Co.*, 318 U.S. 523 (1943); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39–40 (3d. Cir. 1989). The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *Stable Mews*, 41 B.R. at 596). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs,

interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten this Court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

76. Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract. *See In re Rickel Home Center, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also Leonard v. Gen. Motors Corp. (In re Headquarters Dodge, Inc.),* 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

77. Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.*), 103 B. R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. Accord *In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when a prospective

assignee of a lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

78. Additionally, information will be included in the Notice of Assumption and Assignment as part of the Proposed Purchaser Adequate Assurance Information, which will include contact information on where adequate assurance information can be obtained. Adequate assurance of future performance with respect to a Prevailing Purchaser who is not the Stalking Horse shall be presented at the Sale Hearing. Upon closing, the Prevailing Purchaser will have financial resources that are more than sufficient to perform under any executory contracts or unexpired leases it seeks to have assumed by the Debtors. Moreover, if necessary, the Debtors will adduce facts at the Sale Hearing on any objection demonstrating the financial wherewithal of the Stalking Horse or the Prevailing Purchaser, and their willingness and ability to perform under the executory contracts and unexpired leases to be assumed and assigned to it. The Sale Hearing therefore will provide this Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Prevailing Purchaser to provide adequate assurance of future performance under the executory contracts and unexpired leases that it seeks to assume.

79. Accordingly, the Debtors respectfully submit that the procedures proposed herein for executory contracts and unexpired leases being assumed and assigned on the Closing Date are appropriate and reasonably tailored to provide Contract Notice Parties with adequate notice in the form of the Notice of Assumption and Assignment of the proposed assumption and/or assignment of their applicable contract, as well as proposed Cure Amounts, if applicable.

80. Furthermore, to the extent that any defaults exist under any executory contracts and unexpired lease that is to be assumed and assigned in connection with the Sale of the

Property, the Prevailing Purchaser will cure any such default contemporaneously with or as soon as practicable after consummation of an assumption and assignment of such executory contract or unexpired lease.

81. Accordingly, this Court therefore should have a sufficient basis to authorize the Debtors to assume and assign executory contracts and unexpired leases as may be set forth in the Prevailing Purchaser's purchase and sale agreement.

**G. <u>Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate.</u>**

82. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property... is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease... is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Pursuant to Local Rule 6004-1(b)(iv)(O), the Debtors hereby give notice and request that any Sale Order be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

**<u>NOTICE</u>**

83. The Debtors shall serve a copy of this Motion by first-class mail, postage prepaid, upon the Sale Notice Parties and the Insureds under the Policies and Policy Owners, subject to proof of service to the Insureds under the Policies and Policy Owners to be filed under seal.[7] In

[7] To include the names and addresses of the Insureds and Policy Owners in public filings could potentially violate the United States Department of Health privacy regulations under the Health Insurance Portability and Accountability Act of 1996 (the "**<u>HIPAA Privacy Regulations</u>**") and certain confidentiality provisions of certain transactional documents relating to the Policies (e.g., the Master Policy Purchase Agreement). Service on the Insureds and Policy Owners under seal would be consistent with the Debtors' requirements under the HIPAA Privacy Regulations and other applicable law, and the Debtors' confidentiality obligations and privacy policy under existing agreements. Finally, such service under seal on the Insureds Policy Owners would be consistent with the Guidelines for the Conduct of Asset Sales set forth in General Order M-331 applicable in these cases.

light of the nature of the relief requested, the Debtors submit that no further notice is required or needed under the circumstances.

WHEREFORE, the Debtors respectfully request that this Court enter the Bid Procedures Order, substantially in the form attached as **Exhibit A**, (a) approving the Bid Procedures; (b) approving the Break-Up Fee, Expense Reimbursement and other Bid Protections; (c) scheduling an Auction and a Sale Hearing to approve such sale, and approving the form and manner of notice thereof; (d) approving the Cure Procedures; and (e) granting such other and further relief as this Court deems appropriate. Additionally, the Debtors request that at the Sale Hearing, this Court enter a Sale Order, substantially in the form attached as **Exhibit B,** subject to the result of the Auction and to the Bid Procedures, (a) approving and authorizing the Sale; (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (c) granting such other and further relief as this Court deems appropriate.

[*Remainder of page intentionally left blank*]

Dated: January 29, 2019
Wilmington, Delaware

BAYARD, P.A.

*/s/ Evan T. Miller*
Evan T. Miller (No. 5364)
Sophie E. Macon (No. 6562)
600 N. King Street, Suite 400
Wilmington, DE 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
E-mail: emiller@bayardlaw.com
smacon@bayardlaw.com

- and -

B. Keith Poston *(admitted pro hac vice)*
NELSON, MULLINS, RILEY & SCARBOROUGH LLP
1320 Main Street
Columbia, SC 29201
Phone: (803) 255-9518
Facsimile: (803) 255-9038
E-Mail: keith.poston@nelsonmullins.com

Shane G. Ramsey *(admitted pro hac vice)*
John T. Baxter *(admitted pro hac vice)*
NELSON, MULLINS, RILEY & SCARBOROUGH LLP
150 Fourth Avenue, North, Suite 1100
Nashville, TN 37219
Phone: (615) 664-5355
Facsimile: (615) 664-5399
E-Mail: shane.ramsey@nelsonmullins.com
john.baxter@nelsonmullins.com

*Counsel to the Debtors and Debtors in Possession*