## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re<br><br>LIFE SETTLEMENTS ABSOLUTE<br>RETURN I, LLC, *et al.*,[1]<br><br>                Debtors. | Chapter 11<br><br>Case No. 17-13030 (MFW)<br>(Jointly Administered)<br><br>RE: D.I. 265 |

## THE SETTLEMENT GROUP, INC.'S OBJECTION TO SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS TO ENSIGN PEAK ADVISORS, INC. AND MEMORANDUM OF LAW IN SUPPORT

Dated:  April 28, 2019

David M. Powlen (DE Bar No. 4978)
Kevin G. Collins (DE Bar No. 5149)
**BARNES & THORNBURG LLP**
1000 N. West Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 300-3434
Facsimile: (302) 300-3456
Email:  David.Powlen@btlaw.com
       Kevin.Collins@btlaw.com

Gerrit M. Pronske (*pro hac vice*)
Jason P. Kathman (*pro hac vice*)
**PRONSKE & KATHMAN, P.C.**
2701 Dallas Parkway, Suite 590
Plano, TX 75093
Telephone: (214) 658-6500
Facsimile: (214) 658-6509
Email:  gprponske@pgkpc.com
       jkathman@pgkpc.com

**COUNSEL FOR**
**THE SETTLEMENT GROUP, INC.**

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Life Settlements Absolute Return I, LLC (7992) and Senior LS Holdings, LLC (5731). The mailing address for the Debtors, solely for purposes of notices and communications, is: 6650 Rivers Avenue, Suite 105 #81921, North Charleston, SC 29406-4829, with copies to Nelson Mullins Riley & Scarborough LLP, c/o Shane G. Ramsey, 150 Fourth Avenue North, Suite 1100, Nashville, TN 37219 and Bayard, P.A., c/o Evan T. Miller, 600 N. King Street, Suite 400, Wilmington, DE 19801.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ iii

PRELIMINARY STATEMENT ...................................................................................................... 1

BACKGROUND ............................................................................................................................. 2

    A.    THE INDENTURE AND GERS LITIGATION. ........................................................................ 3
    B.    THE BID PROCEDURES. ...................................................................................................... 4
    C.    THE AUCTION. ................................................................................................................... 6
    D.    THE MULTIPLE ADJOURNMENTS ................................................................................... 14

ARGUMENT AND AUTHORITY ............................................................................................... 16

    A.    ENSIGN PEAK COULD NOT BID AT THE AUCTION BECAUSE IT DID NOT SUBMIT A QUALIFYIED BID. ...........17
    B.    ENSIGN PEAK MAY NOT CREDIT BID. ............................................................................ 18
    C.    MULTIPLE CREDIT BIDS ARE NOT AUTHORIZED BY THE BID PROCEDURES.................... 21
    D.    NEITHER ENSIGN PEAK NOR WELLS FARGO HAS A SECURITY INTEREST IN THE DEBTORS' CLAIMS AND CAUSES OF ACTION.................................................................................................................22
    E.    ENSIGN PEAK'S CREDIT BID APA CONTAINS IMPERMISSIBLE RELEASES ..................... 26

CONCLUSION ............................................................................................................................. 26

# TABLE OF AUTHORITIES

## Cases

*Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*,
    269 F.3d 726 (6th Cir. 2001) ............................................................ 16

*Covenant at South Hills, Inc.*,
    410 B.R. at 431 ............................................................................... 19

*In re 222 Liberty Assoc.*,
    108 B.R. 971 (Bankr. E.D. Pa. 1990) ............................................... 22

*In re CHL, LLC*,
    Case No. 18-00630, 2018 WL 3025310, at *4 (Bankr. E.D.N.C. June 14, 2008)............ 22

*In re Covenant at South Hills, Inc.*,
    410 B.R. 426 (Bankr. W.D. Pa. 2009) ............................................... 19

*In re CS Mining, LC*,
    574 B.R. 259 (Bankr. D. Utah 2017) ................................................ 22

*In re Diebart Bancroft*,
    Case No. 92-3744, 1993 WL 21423, at *5 (E.D. La. Jan. 26, 1993) ............................... 22

*In re Family Christian, LLC*,
    533 B.R. 600 (Bankr. W.D. Mich. 2015)........................................... 15

*In re Integrated Testing Products Corp.*,
    69 B.R. 901 (D.N.J. 1987) ............................................................... 24

*In re Ludford Fruit Productions Inc.*,
    99 B.R. 18 (Bankr. C.D. Ca. 1989);.................................................. 24

*In re Pearson Industries, Inc.*,
    178 B.R. 753 (Bankr. N.D. Ill. 1995) ............................................... 24

*In re Tek-Aids Industries, Inc.*,
    145 B.R. 253 (Bankr. N.D. Ill. 1992) ............................................... 23

*Mizuho v. Enron Corp.*,
    2005 WL 356985, at *6 (S.D.N.Y. Feb. 15, 2005))........................... 19

**Statutes**

11 U.S.C. § 363(k) ....................................................................................................... 22

11 U.S.C. § 506(a)(1) .................................................................................................. 18

11 U.S.C. § 552(a) ....................................................................................................... 23

**Rules**

Fed. R. Bankr. P. 2002(a)(3) ...................................................................................... 25

Fed. R. Bankr. P. 9019 ................................................................................................ 25

The Settlement Group, Inc. ("**TSG**") hereby submits this objection (the "**Objection**") to the sale of substantially all of the Debtors' assets to Ensign Peak Advisors, Inc. ("**Ensign Peak**").[2]  In support of this Objection, TSG represents as follows:

## PRELIMINARY STATEMENT

1.    At the conclusion of the auction in Greenville, South Carolina, Debtors' counsel unequivocally stated on the record: "[t]he bid that was submitted this morning by Ensign Peak was [] violative of certain components of the bid procedures order." Courts approve bid procedures and enter bid procedures orders to promote fundamental fairness and ensure that all parties are playing by the same rules. Despite stating on the record that Ensign Peak's credit bids were violative of the Bid Procedures,[3] the Bid Procedures approved by this Court were continually and systematically disregarded and undermined. More specifically and as explained more fully herein, multiple bidders were permitted to participate who did not provide a Qualified Bid by the Bid Deadline, a creditor (Ensign Peak and/or Wells Fargo) was allowed to credit bid for assets (Chapter 5 causes of action) in which it does not have a lien, and a bid was accepted which purports to settle estate claims and causes of action without the necessary notice and approval required by the Federal Rules of Bankruptcy Procedure (9019). In sum, the auction process was used to setup what amounts to practically a *sub rosa* plan that disposes of all of the Debtors' assets, settles existing litigation and releases both the Debtors, their principals, Ensign Peak, GERS, and Wells Fargo. The failure to conform to the Bid Procedures is cause for the

---

[2] TSG notes that the Notice of Winning Bidder purports to name "Wells Fargo Bank, N.A., in its capacity as indenture trustee under that certain Indenture dated as of June 12, 2008, acting on behalf and at the direction of Ensign Peak Advisors, Inc." as the "Winning Bidder." However, based upon the facts and for the reasons explained more fully herein, Ensign Peak was the party that made the bid that the Debtors are claiming was the highest bid. Further, as specified in the Ensign Peak Final APA (as that term is defined herein), Ensign Peak is the purchaser of the assets.
[3] Unless otherwise specifically defined herein, capitalized terms shall have the meaning ascribed to them in the Bid Procedures.

Court to deny any sale to Ensign Peak (or Wells Fargo on their behalf) and instead should approve the sale to the Back-Up Bidder, The Settlement Group, Inc.

## BACKGROUND

2.        On December 29, 2017 (the "**Petition Date**"), Life Settlements Absolute Return I, LLC ("**LSAR**") and Senior LS Holdings, LLC ("**Senior LS**" and together with LSAR, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above captioned bankruptcy cases (collectively, the "**Chapter 11 Cases**"). On the same day, the Debtors filed a motion directing joint administration of the Chapter 11 Cases. On January 5, 2018, the Court entered an order directing the joint administration of the Chapter 11 Cases [D.I. 25].

3.        Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors in-possession.  To date, no official committees have been appointed in these Chapter 11 Cases and no request has been made for the appointment of a trustee or an examiner.

4.        According to the Debtors' first day pleadings, LSAR was formed as a special purpose vehicle to invest in life insurance policies (the "**Policies**") in the life settlement market.[4] The Policies were issued by leading insurance companies to individuals who are generally wealthy and desire to sell their Policies and the related benefits, rather than surrender them to the issuing insurance company for less value (the "**Insureds**").[5] Upon purchasing a policy, the investor maintains such policy by paying the premiums and any related costs (collectively, the "**Premiums**") until the insured individual passes away. At such time, the investor, as the owner and beneficiary of the policy, is entitled to the death benefit proceeds.

---

[4] *See Declaration of Robert J. Davey, III in Support of Chapter 11 Petitions and First Day Motion* (the "**Davey First Day Declaration**")[D.I. 7] at ¶ 16.
[5] *See* Davey First Day Declaration at ¶ 17.

5.      As explained in the Debtors' first day pleadings, LSAR is a wholly-owned subsidiary of Attilanus *f/k/a* The Atticus Fund I, L.P. ("**Attilanus**").[6] Attilanus is managed by its general partner, Anysia Financial Management, LLC ("**Anysia**"), which Robert Davey ("**Davey**"), the Debtors' principal, serves as an officer and director.

6.      Further, although the Debtors do not have any employees, Anysia engages Clear View Advisors Corporation ("**CVACorp**") to provide services relating to the preparation of monthly reports to the Indenture, as well as other services related to servicing the Policies.[7] CVACorp is also owned and managed by Davey.

**A.      The Indenture and GERS Litigation.**

7.      LSAR is a party to that certain Trust Indenture by and between Life Settlements Absolute Return I, LLC, as Issuer, and Wells Fargo, N.A., as Trustee, dated as of June 12, 2008 (the "**Indenture**").[8] Pursuant to the Indenture, Wells Fargo ("**Wells Fargo**" or "**Trustee**") is the Policy Administrator and Trustee. Under the Indenture, LSAR purportedly issued preference notes in the principal amount of $40 million (the "**Preference Notes**") mezzanine notes in the principal amount of $24 million (the "**Mezzanine Notes**"), and residual notes in the amount of $110,222,499 (the "**Residual Notes**," and collectively with the Preference Notes and the Mezzanine Notes, the "**2008 Notes**").  As of the Petition Date, the Preference Notes were allegedly held by Ensign Peak Advisors, Inc. ("**Ensign Peak**").[9]

8.      Pursuant to the Indenture, LSAR granted a security interest in certain collateral (including the Policies and the proceeds thereof) to "[Wells Fargo] and its successors and assigns

---

[6] *See* Davey First Day Declaration at ¶ 9.
[7] *See* Davey First Day Declaration at ¶ 22.
[8] *See* Indenture at 1. A copy of the Indenture received from Debtors' counsel is attached hereto at **Exhibit A.**
[9] On March 29, 2018, Ensign Peak filed its Proof of Claim (the "**Ensign POC**"). The Ensign POC unequivocally states that the "basis for perfection" of its claim is "Trustee (for benefit of Securityholders) holds collateral." A true and correct copy of the relevant portions of the Ensign POC is attached hereto as **Exhibit B.**

for the benefit of the Securityholders and any agent, lender or lenders under the Credit Facility."[10]

9.      In addition to the parties to the Indenture, The Government Employees' Retirement System of the Virgin Islands f/k/a the Employees' Retirement System of the Virgin Islands ("**GERS**") asserts a claim in the amount of $14,527,076.69 (the "**GERS Claims**").[11] GERS argues that its claims are also secured pursuant to the Indenture, because, according to GERS, its claims arise pursuant to a "credit facility" that is authorized pursuant to the Indenture. The Debtors and Wells Fargo both dispute this position and the issue of whether GERS is secured by the Indenture (along with a number of other issues) is the subject of the adversary proceeding styled: *The Government Employees' Retirement System of the Virgin Islands f/k/a the Employees' Retirement System of the Virgin Islands v. Life Settlements Absolute Return I, LLC, et, al*, Adv. No. 18-50677-MFW, currently pending before this Court (the "**GERS Adversary**"). Importantly, both Wells Fargo and the Debtors take the position in the GERS Adversary that Wells Fargo is the Debtors' "sole" secured party in this case.[12]

**B.      The Bid Procedures.**

10.      On February 26, 2019, after a contested hearing on the terms and provisions of the proposed bid procedures, the Court entered its *Order Pursuant to 11 U.S.C. §§ 105, 363, 365, 503 and 507 and Bankruptcy Rules 2002, 6004 and 6006 (A) Establishing Bid and Auction Procedures for the Proposed Sale of Substantially All of the Debtors' Assets; (B) Approving the Purchase and Sale Agreement; (C) Approving Related Bid Protections; (D) Scheduling an*

---

[10] *See* Indenture at 2-3.
[11] *See* Claim Register No. 3-1 (the "**GERS POC**"). A true and correct copy of the GERS POC is attached hereto as **Exhibit C.**
[12] *See Opening Brief in Support of Wells Fargo Motion for Summary Judgment* at 9 [Adv. D.I. 73] ("**WF GERS MSJ Brief**"); *Memorandum of Law in Support of the Motion of Defendants/Counterclaim Plaintiffs Life Settlements Absolute Return I, LLC and Senior LS Holdings, LLC for Partial Summary Judgment* at 20 [Adv. D.I. 70] (the "**Debtors' GERS MSJ Brief**").

*Auction and Sale Hearing and Approving Notice Thereof; (E) Approving Procedures for Determining Cure Amounts for Executory Contracts and Unexpired Leases to be Assumed and Assigned and Notice Thereof; and (F) Granting Related Relief* (the "**Bid Procedure Order**") [D.I. 311]. The Bid Procedures Order finds that the Asset Purchase Agreement submitted by TSG (the "**TSG APA**") was the best offer the Debtors received as a result of their pre-petition efforts to market the Policies.[13]   Additionally, the text of the Bid Procedures Order provides:

> No bid shall be deemed to be a Qualifying Bid (as defined in the Revised Bid Procedures) or otherwise considered for any purposes unless such bid meets the requirements set forth in the Revised Bid Procedures. As set forth in the Revised Bid Procedures, any Qualifying Bid shall provide sufficient cash to pay, in full, at closing an amount equal to or greater than the aggregate of (a) the consideration offered for the Property in the Purchase and Sale Agreement, plus (b) the Break-Up Fee and Expense Reimbursements (i.e., $600,000), plus (c) $100,000.[14]

11.     Among other things, the Bid Procedures Order approves the Bid Procedures (the "**Bid Procedures**").[15]   The Bid Procedures provide, *inter alia*:

- A "**Qualified Bidder**" is a Potential Bidder that delivers the documents described in Section D, below, and that the Debtors, in consultation with the Consultation Parties (as defined herein), determine is reasonably likely (based on financial information submitted by the Potential Bidder, the availability of financing, experience and other consideration deemed relevant by the Debtors, in consultation with the Consultation Parties, to be able to consummate a Transaction if selected as the Prevailing Purchaser (as defined herein).[16]

- To be deemed a "**Qualified Bid**," a bid must be received from a Qualified Bidder no later than the Bid Deadline (as defined below) including the following information

  (a) states such Qualified Bid offers (i) to purchase all or substantially all of the Property, or (ii) restructure one or both of the Debtors and its or their business upon the terms and

---

[13] *See* Bid Procedures Order at ¶ E.
[14] *See* Bid Procedures Order at ¶ 7.
[15] *See* Bid Procedures at ¶ 4. A true and correct copy of the Bid Procedures is attached hereto at **Exhibit D.**
[16] *See* Bid Procedures at 2.

conditions set forth in a Restructuring Term Sheet, which the Debtors reasonably determine, in consultation with the Consultation Parties, is no less favorable than the terms and conditions of the [TSG APA];[17]

(j) is likely to result in a value of the Debtors' estates in the Debtors' business judgment that is more than the aggregate of the value of the sum of: (i) the Purchase Price, as identified in the [TSG APA]; plus (iii)[sic] the sum of the Break-Up Fee and Expense Reimbursement, as defined in the Bid Procedures Order, for both BPCP Life Settlements LLC ("**BPCP**") and [TSG] (i.e., $600,000); plus (iv) $100,000 ("**Minimum Topping Amount**");[18]

- Any party (other than [TSG] and Trustee) that does not submit a bid by the Bid Deadline…will not be allowed to (i) submit any offer after the Bid Deadline or (ii) participate in the Auction.[19]

- In connection with the Sale of all or any portion of the Property, a person or entity holding a perfected security interest in any such Property may, pursuant to section 363(k) of the Bankruptcy Code, seek to credit bid some or all of its claims secured by such security interests for the property in which it holds such security interest (each such bid, a "Credit Bid"), provided that such claims and/or security interests are not subject to a bona fide dispute.[20]

- Notwithstanding the foregoing, it is expressly understood and agreed that the Trustee shall be entitled, but not obligated, to submit a Credit Bid (provided it has received direction and indemnification from its noteholders) with a purchase price equal to an amount up the Trustee's security interest in the Property; provided that such bid shall be the only bid submitted by the Trustee pursuant to these Bid Procedures.[21]

**C.    The Auction.**

12.    Prior to the Auction, in addition to TSG's bid (which was deemed a Qualified Bid pursuant to the Bid Procedures Order),[22] the Debtors received three other bids. Specifically, the

---

[17] *See* Bid Procedures at 3.
[18] *See* Bid Procedures at 5.
[19] *See* Bid Procedures at ¶ 15.
[20] *See* Bid Procedures at ¶ 12.
[21] *See* Bid Procedure at ¶ 13.
[22] *See* Bid Procedures Order at ¶ 26 ("For the avoidance of doubt, the Proposed Purchaser [TSG] is a Qualifying Bidder and the transaction set forth in, and by virtue of, the Purchase and Sale Agreement, is a Qualifying Bid.").

bids consisted of: (i) $6.7 million cash bid from Treisigh Fund LLC (the "**Treisigh Initial Cash Bid**"); (ii) $7.1 million cash bid from Berkshire Settlements, Inc. (the "**Berkshire Initial Cash Bid**"); and (iii) $6.7 million cash bid from Ensign Peak (the "**Ensign Cash Bid**"). Importantly, the asset purchase agreement submitted with the Ensign Cash Bid (the "**Ensign Cash Bid APA**")[23] included in the definition of "Assets" the following:

> (c) any rights, claims or causes of action of any of the Sellers against Third Parties to the extent Primarily Related to any of the Assets, whether arising before or after the Closing, **including Avoidance Actions** against Third Parties, (d) **the Accounts Receivables**, (e) the Policy Files, (f) all rights of the Sellers under non-disclosure or confidentiality agreements with employees and agents of the Sellers or with Third Parties to the extent related to the other Assets, and (g) the Policy Rights.[24]

13.　　On April 17, 2019, Debtors' counsel commenced the Auction in Greenville, South Carolina. Debtors' counsel announced that the highest bid the Debtors received prior to the Auction was the Berkshire Initial Cash Bid of $7.1 Million. After announcing the order of bidding and going off the record to confer with Ensign Peak's counsel, Debtors' counsel came back on the record whereby Ensign Peak's counsel announced that Ensign Peak would be submitting a credit bid in the amount of $11 Million (the "**Ensign Initial Credit Bid**").[25] At no time during the Auction did Wells Fargo's attorney, who was present at the Auction, state that the credit bid was being submitted by Wells Fargo, who was the only secured creditor. In fact, every sentence uttered at the Auction, which thankfully was transcribed, make clear that the Ensign Initial Credit Bid was Ensign's Credit Bid, not that of Wells Fargo.[26] Specifically, counsel for Ensign Peak stated:

---

[23] A true and correct copy of the redline of the Ensign Cash Bid APA is attached hereto as **Exhibit E.**

[24] *See* Ensign Cash Bid APA at 2 (emphasis added).

[25] Along with the Ensign Initial Credit Bid, Ensign Peak submitted a revised Asset Purchase Agreement (the "**Ensign Initial Credit Bid APA**"). A copy of the redline Ensign Initial Credit Bid APA is attached hereto as **Exhibit F.**

[26] Below is the list of the thirteen occasions that the credit bid was made by Ensign Peak, not Wells Fargo.

On behalf of Ensign Peak with an allowed claim and secured creditor in the case and having been -- having instructed the trustees to submit the credit bid, I am submitting a credit bid in the amount of $11 million against their -- the currently outstanding amount of their secured claim.[27]

Counsel for Ensign Peak went on to explain:

it's an $11 million credit bid. This bid resolves the outstanding litigation with GERS. There would be a -- we -- there would be an amount of money that is left behind in the estate to satisfy allowed claims in the bankruptcy case.  And that – the amount of those allowed claims, the cap of that would be $1.2 million. And then it also provides for a sufficient amount to wind down the estate, and the amount of that money is 75,000. The rest of the cash that is in the estate at closing would go to Ensign Peak, and

---

**Page 6:11-18**
        MR. KURTZ:  This is Mark Kurtz from Richards, Layton & Finger. ***On behalf of Ensign Peak with an allowed claim and secured creditor*** in the case and having been – having instructed the trustees to submit the credit bid, ***I am submitting a credit bid*** in the amount of $11 million against their -- the currently outstanding amount of their secured claim.

Ensign's APA makes clear that it is the Ensign debt that is reduced by the credit bid (see Section 2.03, above). So the word "their", above obviously refers to Ensign.

**Page 29:8-9**
        MR. SCHLAUCH [Ensign's Lawyer]:  ***We will stand with our current bid of $12.5 million.***
**Page 30:4-5**
        MR. SCHLAUCH:  Yeah.  ***We*** are still standing at 12.5.
**Page 31:13-14**
        MR. SCHLAUCH:  ***Ensign Peak will stand at its 12.5 credit bid.***
**Page 31:21-22**
         MR. SCHLAUCH:  ***We will stand at the credit bid of 12.5 million.***
**Page 32:6-7**
        MR. SCHLAUCH:  ***Ensign Peak will stand at the 12.5 million credit bid.***
**Page 32:16**
         MR. SCHLAUCH:  ***We will stand at 12.5.***
**Page 33:7-8**
        MR. SCHLAUCH:  ***We stand at our credit bid of 12.5 million.***
**Page 33:21-22**
        MR. SCHLAUCH:  ***Ensign will stand firm at the 12.5 million credit bid.***
**Page 35:8-10**
        MR. MILLER:  As of right now, of course, ***the bid is --Ensign Peak's bid*** is at the highest -- is the highest bid.
**Page 39:7-9**
        MR. SCHLAUCH:  So, you know, just so we are clear, ***Ensign Peak's credit bid*** was timely and was in accordance with the bidding procedures.
**Page 42:13-15**
        MR. MILLER:  ***The bid that was submitted this morning by Ensign Peak*** was also violative of certain components of the bid procedures order,
**Page 42**
        MR. KURTZ:  One other statement.  We just want to go on the record we are of the position that ***our credit bid*** does comply with the bidding procedures order.

[27] *See* Transcript of Auction at 6:13-18. A copy of the Transcript is attached hereto as **Exhibit G.**

> Ensign Peak would use that to pay -- to resolve the GERS litigation with a payment of $7 million.[28]

After receiving a cash bid from Treisigh in the amount of $7.5 Million, the parties took a recess to evaluate the Ensign Initial Cash Bid. Once back on the record, counsel for Ensign Peak again elaborated on the Ensign Initial Cash Bid. Specifically:

> The $11 million credit bid is for all of the policies and all of the related rights associated with those policies. There is a -- the bid will take all of the cash in the estate, but will leave behind 1.2 million for allowed claims, $75,000 as a wind-down budget. Any cash that is left over would then go to pay GERS the resolution amount or the settlement amount of $7 million. And after closing, because Ensign Peak would be taking and holding all the policies, they are agreeing to pay all of the premiums.  So there's not the five-month premium perdition that was in the stalking horse APA.[29]

After additional cash bids, Debtors' counsel took another recess, and once back on the record, Ensign Peak's counsel explained how they were valuing the Ensign Initial Cash Bid:

> The way that we value our bid, the value to the estate -- so we are valuing it at 13,075,000.  The way we get there is we have the $11 million credit bid. We backed out the current cash of 3.2 million that we're buying at closing.  We add back 1,275,000, which amounts for the allowed claim budget and the wind-down budget. And then we -- we added back the $2 million in savings for the five-month premium payments. That's how we are valuing that.  And then the savings to the estate of $2 million in litigation costs —

Counsel for TSG then asked whether Ensign Peak's valuation was accounting for the $300,000 account receivable that was added as an asset in the Ensign Cash Bid APA. Counsel for Ensign Peak admitted that he had not accounted for that, and that the $300,000 value of the account receivable should be factored into the valuation of Ensign Peak's bid.[30] Specifically:

> MR. PRONSKE:   You all added accounts receivable to your definition of purchased assets, and my understanding is there is only one receivable, and it is worth 300,000.

---

[28] *See* Transcript of Auction at 6:20 – 7:8.
[29] *See* Transcript of Auction at 8:17-9:5.
[30] *See* Transcript of Auction at 12:15-18.

| MR. KURTZ: | We have not added that back in. |
| MR. PRONSKE: | Shouldn't that be added back in? |
| MR. KURTZ: | It should be. I was unaware of that.[31] |

From that point forward, in valuing its bid, Ensign Peak accounted for the $300,000 accounts receivable in an amount of $300,000.

14.    The Ensign Initial Credit Bid APA (as compared to the TSG APA) contains, as a condition to closing, releases by the Debtors of Ensign Peak, Wells Fargo and GERS, including the Debtors' claims asserted in the GERS Adversary.[32]

15.    The question was then raised about whether the Ensign Initial Credit Bid was the "baseline" bid. Ensign Peak's counsel noted for the record, that the bidding was to occur in successive rounds and that the Debtors were modifying and deviating from the Bid Procedures.[33] Debtors' counsel then confirmed that the Debtors were indeed modifying the bid procedures to allow cash bidders to continue bidding.[34]

16.    After several additional rounds of cash bids, additional questions were raised as to how the Debtors valued the Ensign Initial Credit Bid. The questions centered on how the Debtors and their counsel valued the avoidance actions and other litigation being purchased by the Ensign Initial Credit Bid.[35] Ultimately, the Debtors, Ensign Peak and GERS agreed for purposes of the Auction to value the GERS Litigation at $10 Million. In response, when the bidding came back to Ensign, they raised their credit bid to $21 Million (the "**Ensign Revised Credit Bid**") to give value for the $10 Million in litigation claims being purchased. This was Ensign Peak's second

---

[31] *See* Transcript of Auction at 15:19-25.
[32] *See* Ensign Initial Credit Bid APA at § 7.08(a) and (b).
[33] *See* Transcript of Auction at 14:14-20.
[34] *See* Transcript of Auction at 15:10-13.
[35] *See* Transcript of Auction at 18:22-19:25.

credit bit, which, as discussed below, also violated the Bid Procedures. As explained by Ensign's counsel:

> We increase our credit bid in the amount of -- to the amount of $21 million. And with a litigation resolution valued at $2 million, a payment of premiums on the closing date of $2 million, the allowed claims cap of $1.2 million, the residual amount of $75,000, for a total of $26.275 million in value.  An additional value and deductions for cash of 3.2 million; the account receivable, $300,000. During the break, we were informed by the Debtors' counsel of a GERS escrow amount related to the litigation of $267,000.  At least, that was the amount represented to us by the Debtors. And a GERS claim, as discussed earlier in the auction, valued at $10 million. So deductions of $13.767 million. When you take the additions minus the deductions, Ensign Peak's credit bid is valued at $12,508,000.[36]

17.    As indicated by the above quote, Ensign was arguing that its $25 million credit bid was valued at $12.508 million. That valuation is incorrect for a couple of obvious reasons: First, the $267,000 addition to value due to the GERS litigation escrow account is a "double-dip" of the estimated $2 million in litigation costs. If the Ensign valuation is correct, then the GERS litigation cost is really $2.267 million, not $2.0 million. If the GERS litigation cost is really $2.0 million (which is what Ensign argued), the $267,000 litigation escrow would have been applied to that $2.0 estimated cost, thereby making the cost really (1) $267,000 from the GERS litigation escrow and (2) $1.733 million in cash (to make up the total of $2.0 million). Therefore, the value was overstated by an obvious $267,000. Second, the estimated litigation cost savings of $2.0 million was grossly overstated and bore no relationship to reality. Further, since Ensign was not paying consideration of $2.0 million, it should not be permitted to add $2.0 million to consideration paid for the Debtor's assets – this number is pure speculation and is not monetary consideration. If the $2.0 million in value improperly ascribed by Ensign, the value of the $21.0 million credit bid was $10.508 million, which was $200,000 less than TSG's ultimate bid of $10.7 million ($10.4 million plus the stalking horse credit of $300,000).

---

[36] Transcript of Auction at 25:18-26:10.

18.     Upon being asked what the equivalent cash bid amount was, Debtors' counsel responded:

> Here is the issue that we have now, is that Ensign Peak's bid is 12.8, but we have issues with their asset purchase agreement and some of the terms in their asset purchase agreement that we just received this morning. And until such time as we can work those out -- if we can't work those out, then we may not accept the bid even if the credit bid is higher than what a cash bid would be.[37]

19.     After a number of additional rounds of cash bids where Ensign referred to the Ensign Revised Bid as their own credit no less than eight times, TSG was ultimately the highest remaining cash bid of $10.4 million plus its break-up fee and expense reimbursement, for a value of $10.7 million to the estate.[38]

20.     After a short recess, the parties came back on the record where Treisigh again chose to pass.[39] Ensign then increased the credit portion of its bid to $25 Million (the "**Ensign Second Revised Credit Bid**").[40]

21.     Debtors' counsel then announced that it was going to adjourn the auction (the "**First Adjournment**") until Monday, April 22, 2019 at 10:00 a.m. (EST) in order to allow TSG and Treisigh to determine whether to make a further bid, and potentially a joint bid.[41] In connection with the adjournment, the Debtors filed their *Notice of Adjourned Auction* [D.I. 355]. The Notice of Adjourned Auction specifically states: "**that the deadline to submit bids for the Adjourned Auction is Sunday, April 21**, 2019 at 5:00 p.m." (the "**Adjourned Bid Deadline**").

---

[37] Transcript of Auction at 26:24-27:7.
[38] Transcript of Auction at 33:18-25.
[39] Transcript of Auction at 34:10.
[40] Transcript of Auction at 34:15-16.
[41] Transcript at 35:1-6.

22.     After the First Adjournment, Ensign Peak submitted another revised Asset Purchase Agreement (the "**Ensign Second Revised Credit Bid APA**").[42] The Ensign Second Revised Credit Bid APA continued to include within the definition of "Assets" claims and causes of action against third parties and continued to contain releases of Ensign Peak, Wells Fargo, and GERS.[43] However, now included for the first time, where Ensign Peak's prior APAs had "*reserve[d] all rights it has for any claims or causes of action…against [the Debtors] for fraud committed by or intentional representations made by [the Debtors] or any of their representatives with respect to the Assets and the transaction contemplated by the [APA]*"[44] Ensign Peak was now giving **releases** to Debtors "and each of their affiliates that is a debtor in the jointly-administered Bankruptcy Case and any of their individual officers or directors and managers (solely in such capacity) arising prior to closing."[45]

23.     Prior to the Adjourned Bid Deadline, counsel for TSG informed Debtors' counsel that TSG would not be submitting joint bid with Treisigh, because after reviewing the Bid Procedures it was determined that the Bid Procedures prohibited joint bids.

24.     Pursuant to the Debtor's Adjourned Bid Deadline of Sunday, April 21 at 5:00 p.m. (at which time no additional bids were made), the bidding was over as of that deadline. During the subsequent reconvened session of the Auction, where the announcement of a winner was anticipated, the Debtor **never commenced any further bidding**, and the Debtor **never announced that further bids could be made**. It is clear from the various Transcripts of the Auction that the bidding was concluded, consistent with the filed Notice of the Adjourned Bid Deadline of Sunday, April 21 at 5:00 p.m.

---

[42] A copy of the redline of the Ensign Second Revised Credit Bid APA is attached hereto as **Exhibit H**.
[43] *See* Ensign Second Revised Credit Bid APA at 2.
[44] *See* Ensign Cash Bid APA § 11.11; Ensign Initial Credit Bid APA § 11.11.
[45] *See* Ensign Second Revised Credit Bid APA at ¶ 7.08(c).

**D.       The Multiple Adjournments.**

25.       On Monday, April 21, 2019 at 10:08 a.m. (EST) the parties reconvened via telephone. Debtors' counsel took two recesses only to further adjourn the auction until 3:00 p.m. (EST) later that day.[46] The parties reconvened via teleconference at 3:07 p.m. only to have Debtors' counsel convey that they were still working through issues with the Ensign Peak's credit bid. Debtors' counsel then adjourned the auction (the "**Second Adjournment**") for a second time until Tuesday, April 22, 2019 at 3:00 p.m. (EST).[47] As with the morning session and, again, consistent with the Debtor's Adjourned Bid Deadline, the bidding was not re-opened. In connection with the second adjournment, the Debtors filed their *Second Notice of Adjourned Auction* [D.I. 362]. The Second Notice of Adjourned Auction did not re-open the bidding deadline of April 21.

26.       On Tuesday, April 22, 2019 at 3:00 p.m. (EST) the parties again reconvened via teleconference and again they were told that the Debtors were still working through issues with the Ensign Peak's credit bid. As with the prior re-convened sessions and, again, consistent with the Debtor's Adjourned Bid Deadline, *the bidding was not re-opened*. Debtors' counsel then adjourned the auction (the "**Third Adjournment**") for a third time until Thursday, April 25, 2019 at 3:00 p.m. (EST). In connection with the third adjournment, the Debtors filed their *Third Notice of Adjourned Auction* [D.I. 365]. The Third Notice of Adjourned Auction did not re-open the bidding deadline of April 21.

27.       On Thursday, April 25, 2019 the parties again reconvened via teleconference and again they were told that the Debtors were still working through issues with the Ensign Final Credit Bid. Debtors' counsel then adjourned the auction indefinitely (the "**Fourth**

---

[46] Transcript at 65:17-20.
[47] Transcript 17:19-22.

**Adjournment**") for a fourth time until an unspecified time. As with the prior re-convened sessions and, again, consistent with the Debtor's Adjourned Bid Deadline, ***the bidding was not re-opened***. In connection with the Fourth Adjournment, the Debtors filed their *Fourth Notice of Adjourned Auction* [D.I. 365], which set the adjourned auction for April 26, 2019 at 3:00 p.m. (EST). The Fourth Notice of Adjourned Auction did not re-open the bidding deadline of April 21.

28.     On Friday, April 26, 2019, the parties again reconvened via teleconference (the "**Friday Auction**"). At the Friday Auction, Ensign Peak again raised its credit bid, this time to $30 Million (the "**Ensign Final Credit Bid**"). This Bid was permitted after the Bidding Deadline of April 21, which was never changed, and the Debtor did not reopen bidding for any other bidding party. Ensign was simply permitted to make another Bid days after the Debtor's written bidding deadline, and no other party was permitted to make a counter. In conjunction with the Ensign Final Credit Bid, Ensign Peak submitted another further revised asset purchase agreement (the "**Ensign Final Credit Bid APA**").[48] This Bid, submitted 5 days after bids were officially shut down by the Debtor in writing, was the first Ensign Bid that contained the signature of Wells Fargo. The Ensign Final Credit Bid APA further enhanced the releases for the Debtors' and its principals (which started as a threat in the first and second Ensign APA's to sue the Debtor and its representatives for fraud). The Ensign Final Credit Bid APA further enhanced the releases for the Debtors' and its principals (which started as a threat in the first and second Ensign Peak APAs to sue the Debtors and its representatives for fraud) as it now included releases not only for the Debtors' affiliates that are debtors in this case, but also the "Non-Debtor Affiliates," which includes CVACorp (an entity owned by the Debtors' representative making

---

[48] A copy of the redline of the Ensign Final Credit Bid APA is attached hereto as **Exhibit I.**

the decision on which Bid to choose as the winning bid), Attilanus, and Anysia.[49] The Debtors,

their principals, and their affiliates (debtor and non-debtor) also will receive releases from Wells

Fargo under the Ensign Final Credit Bid APA.[50] After the announcement, the Debtors filed their

*Notice of Winning Bidder* (the "**Winning Bidder Notice**") [D.I. 370].

29.     On April 26, 2019, the Debtors filed their *Notice of Agenda of Matters Scheduled*

*for Hearing on April 30, 2019 at 10:30 A.M. (ET)* (the "**Sale Hearing Agenda**") [D.I. 369],

which reset the hearing on approval of the sale to May 1, 2019 at 2:00 p.m. (ET).

## ARGUMENT AND AUTHORITY

30.     When a court "perceives any degree of fraud, unfairness or mistake with the sale,

*including any flaws with an auction pro*cess, the court should assess the impact of these factors

on the sale […]." *See In re Family Christian, LLC*, 533 B.R. 600, 622 (Bankr. W.D. Mich. 2015)

(*citing In re Embrace*, 178 B.R. 112, 120 (Bankr. W.D. Mich. 1995)) (emphasis added). "Where

a proposed sale would benefit an insider of a debtor, the court is required to give heightened

scrutiny to the fairness of the value provided by the sale and the good faith of the parties in

executing the transaction. *See In re Family Christian, LLC*, 533 B.R. at 622 (*citing Ricker &*

*Assocs., Inc. v. Smith (In re Rickel Assocs., Inc.)*, 272 B.R. 74, 100 (Bankr. S.D.N.Y 2002)); *see*

*also In re Embrace*, 178 B.R. at 126; *Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics,*

*Inc.)*, 269 F.3d 726, 745 (6th Cir. 2001). In this case, the Debtors and their counsel blatantly

violated the Bid Procedures, disregarded the Bankruptcy Code and Bankruptcy Rules, and agreed

to a bid that provides the Debtors' principals, counsel and lenders with releases that would

otherwise be subject to creditor and judicial scrutiny. In order to protect the integrity of the Bid

---

[49] *See* Ensign Final Credit Bid APA at § 7.08(c).
[50] *See* Ensign Final Credit Bid APA at § 7.08(d).

Procedures and ensure conformance to bid procedures in future cases, the Court should deny approval of the sale to Ensign Peak and/or Wells Fargo.

### A. Ensign Peak Could Not Bid at the Auction Because it Did Not Submit a Qualified Bid.

31.    As outlined above, the Bid Procedures specify the parameters and requirements that must be met in order for a party to attend the Auction and bid on the Debtors' assets. More specifically, in order to attend the Auction and bid on the Debtors' assets a party must have submitted a "Qualified Bid" (as that term is defined in the Bid Procedures) prior to the Bid Deadline.[51]

> i.    *The Ensign Cash Bid was less favorable than the terms of the TSG Stalking Horse APA.*

32.    Pursuant to Section D(a) of the Bid Procedures, to be deemed a "Qualified Bid" a "Qualified Bidder" must submit a bid that "is no less favorable than the terms and conditions of the [TSG APA]." The Ensign Cash Bid and related Ensign Cash Bid APA were both significantly less favorable than the TSG APA. More specifically, the Ensign Cash Bid APA included at least two significant assets that were not included in the TSG APA—the Accounts Receivables (as that term is defined in the Ensign Cash Bid APA and each of the subsequent credit bid APAs) and litigation claims and causes of action, including Avoidance Actions (as that term is defined in the Ensign Cash Bid APA, and each of the subsequent credit bid APAs). Ensign's counsel admitted on the record that the Accounts Receivables were worth at least $300,000 and should accordingly be included in any valuation of its bid.[52] Further, each time Ensign Peak explained the value of its credit bid, it would subtract the $300,000 value of the Accounts Receivables.

---

[51] As defined in the Bid Procedures Order, "Bid Deadline" was April 12, 2019 at 5:00 p.m. (prevailing Eastern Time). *See* Bid Procedures Order at ¶ 7.
[52] *See* Transcript of Auction at 12:15-18.

33.     Further, the Ensign Cash Bid APA included "Avoidance Actions" within the definition of assets. On the record, for purposes of valuing bids, the Debtors and Ensign Peak valued at least the GERS litigation at $10 Million. As such, when the break-up fees and expense reimbursements ($600,000), the accounts receivable ($300,000), and litigation (at least $10 Million) are subtracted from the $6.7 Million bid, the net value to the estate was a negative $4,200,000. Hardly a bid that is "no less favorable than the [TSG APA]." Because the Ensign Cash Bid was not a "Qualified Bid," Ensign Peak did not submit a Qualified Bid by the Bid Deadline and thus, pursuant to paragraph 15 of the Bid Procedures, was not permitted to participate in the Auction.

ii.     *Ensign Peak's Bid Did Not Meet the Minimum Topping Amount.*

34.     Similarly, the Ensign Cash Bid did not meet the "Minimum Topping Amount," as required by section (D)(j) of the Bid Procedures. In order to be considered a "Qualified Bid" the bid must be likely to result in to the Debtors' estates in the Debtors' business judgment that is more than the aggregate value of the sum of (i) $6 Million; (ii) the sum of the break-up fee and expense reimbursements for both BPCP and TSG in the aggregate amount of $600,000; and (iii) $100,000.00.  *See* Bid Procedures § D(j). Thus, in order to comply with the Minimum Topping Amount, each bid was required to be, at a minimum, $6.7 million. As explained above, the net effect of the Ensign Credit Bid was negative 4,200,00.00. Consequently, the Ensign Cash Bid was not a "Qualified Bid" and therefore Ensign Peak could not participate at the Auction.

**B.     Ensign Peak May Not Credit Bid.**

35.     Each of Ensign Peak's credit bids are not allowed because Ensign Peak is not a secured creditor. Section 506(a) of the Bankruptcy Code determines the extent that a creditor may be a "secured" creditor.  It specifically states:

> An allowed claim of a creditor is secured by a lien on property in which
> the estate has an interest . . . is a secured creditor to the extent of the value
> of such creditor's interest in the estate's interest in such property . . . and is
> an unsecured claim to the extent that the value of such creditor's interest
> … is less than the amount of such allowed claim.

*See* 11 U.S.C. § 506(a)(1) (emphasis added). It is undisputed that Ensign Peak does not have a

security interest in any of the Debtors' property or the collateral. Rather, the Indenture grants the

security interests to Wells Fargo (Trustee) for the benefit of the "Securityholders" (i.e., Ensign

Peak).[53] Ensign Peak concedes and acknowledges as much in its proof of claim. Under "Basis for

perfection" on its Proof of Claim, Ensign Peak lists "Trustee (for benefit of Securityholders)

holds collateral).[54]

36.    Further, both the Debtors and Wells Fargo have consistently taken the position in

the GERS Adversary that Wells Fargo is the Debtors' "sole" secured Party. *See* WF GERS MSJ

Brief at 9; Debtors' GERS MSJ Brief at 20. Wells Fargo reaffirmed this position in its omnibus

response to TSG and Baypoint's surcharge motions.[55] As explained and argued by both Wells

Fargo and the Debtors in their briefs in the GERS Adversary, the grant language in the Indenture

provides a security interest <u>only</u> to Wells Fargo as the Indenture Trustee. Specifically, the

Indenture provides only Wells Fargo with a secured interest in the Debtor's assets "for the

benefit of the Securityholders [i.e., Ensign Peak]." *See* WF Brief at p.10.

37.    When an indenture creates a lien for the beneficiaries of the indenture, a separate

lien is not created in favor of the beneficiaries; rather, the lien is held by the collateral agent "for

the benefit of the parties to the indenture." *See In re Covenant at South Hills, Inc.*, 410 B.R. 426,

---

[53] *See* Indenture at 2-3.
[54] *See* Ensign POC at 2.
[55] *See Wells Fargo Bank, N.A.'s Omnibus Response to (I) Amended Motion of the Settlement Group, Inc. for Entry of an Order Authorizing the Surcharge of Secured Creditor's Collateral (Proceeds of Sale of Debtors' Assets) and (II) BPCP Life Settlement LLC's Notice Seeking Payment of Break-Up Fee and Expense Reimbursement and Payment from Sale Proceeds* [D.I. 371] at 9 ("Despite its role as the *sole secured party*, the Indenture Trustee has no economic state or beneficial interest in the Collateral.")(emphasis added).

428 (Bankr. W.D. Pa. 2009); *Mizuho v. Enron Corp.*, 2005 WL 356985, at *6 (S.D.N.Y. Feb. 15,

2005). In *Covenant at South Hills*, the court expressly held that the fact that a conveyance under

a loan agreement is for the benefit of a party to the indenture "does not create a lien in favor of

those entities, much less a perfected security interest."  *See Covenant at South Hills, Inc.*, 410

B.R. at 431.  Similar to the facts in *Covenant*, all the documents signed in this case "indicate an

intention to convey a security interest only to the Indenture Trustee."  *See id.* at 432.

38.     The *Enron Corp.* case is in accord. In that case, the Bankruptcy Court for the

Southern District of New York, interpreting grant language similar to the language in the

Indenture, held that the collateral agent was the secured party entitled to enforce remedies in that

case.  Specifically, the *Enron Corp.* court held:

> [A]ppellants are not "secured" in the sense that they would need to be for their
> argument to succeed. As we explained above, Flagstaff granted "all" of its right,
> title and interest in the Pledged Collateral "to the Collateral Agent." That the grant
> was made "for the benefit of" the Bank Group is not sufficient to warrant the
> conclusion that the parties intended to give the Bank Group standing to proceed
> individually against the Pledged Collateral. If this were not so, the agreement's
> distinction between "to" and "for the benefit of" would be rendered meaningless,
> a result that would be inconsistent with well established rules of contract
> interpretation."

2005 WL 356985, at *7.  Like the grant language in *Enron Corp.*, the grant language in the

Indenture in this case grants the security interest to "[Wells Fargo] . . . for the benefit of [Ensign

Peak and Securityholders]."  Thus, Ensign Peak is not a secured creditor with the ability to credit

bid at the auction.  As a result, Ensign Peak is prohibited from credit bidding because only the

collateral agent (Wells Fargo) can enforce the rights against the collateral.

39.     Finally, Section E of the Bid Procedures allows only those persons or entities

"holding a perfected security interest in any such Property may . . . seek to credit bid some or all

of its claims secured by such security interests for the property in which it holds such security

interest." As is obvious and admitted by Ensign Peak, they do not have a perfected security interest in any of the Debtors' property and as such may not credit bid.

### C.    Multiple Credit Bids Are Not Authorized by the Bid Procedures.

40.    To the extent that Ensign Peak and the Debtors argue that Ensign Peak's Initial Credit Bid was "on behalf of Wells Fargo" at the direction of Ensign Peak (which is completely opposite to the 13 admissions in the Transcript that the Credit Bid was Ensign Peak's bid, not Wells Fargo's bid),[56] each of the subsequent credit bids were impermissible because the Bid Procedures, adopted and ordered by this Court, provided that Wells Fargo may make only one credit bid. The Bid Procedures expressly state:

> Notwithstanding the foregoing, it is expressly understood and agreed that the Trustee shall be entitled, but not obligated, to submit a Credit Bid (provided it has received direction and indemnification from its noteholders) with a purchase price equal to an amount up the Trustee's security interest in the Property; **provided that such bid shall be the only bid submitted by the Trustee pursuant to these Bid Procedures**.[57]

Wells Fargo was limited to a single credit bid (plain English interpretation of the above paragraph). The final clause—"provided that such bid shall be the only bid submitted by the Trustee pursuant to these Bid Procedures"—appears plain enough. But when read in context with paragraph 12, the interpretation is bolstered. Paragraph 12 of the Bid Procedures generally recognizes the right to credit bid.[58] The next paragraph (the one quoted above) then begins with a limiting phrase—"notwithstanding the foregoing." Paragraph 13 requires three things of a Wells Fargo Credit Bid: (1) it must have direction and indemnification of noteholders;[59] (2) it must have a certain purchase price; and (3) only one of such credit bids *"shall"* be permitted. In other

---

[56] When Ensign Peak made the Ensign Initial Credit Bid, counsel for Ensign Peak announced that he was speaking and making the bid "on behalf of Ensign Peak."

[57] *See* Bid Procedures at ¶ 13 (emphasis added).

[58] *See* Bid Procedures at ¶ 12.

[59] The alleged instructions and directions have been requested of Wells Fargo by TSG in writing and on the record at the Auction. Both requests have been denied.

words, even though paragraph 12 says the Trustee has the right to credit bid, that right to credit bid is limited by the terms of paragraph 13. Paragraph 13 then states that the Trustee "shall be entitled, but not obligated, to submit *a* Credit ***Bid***." The use of "a" as an indefinite article connotes the singular nature of bid. Paragraph 13 does not read that the Trustee can submit Credit Bids, plural. It says that the Trustee can submit a singular bid and that singular bid **"shall be the only bid submitted by the Trustee pursuant to these Bid Procedures."**

41.     If the Ensign Initial Credit Bid was made by Wells Fargo, then that was the only credit bid it could submit. The Ensign Initial Credit was $11 Million. Even if credit is given for the $1,275,000 in cash being left behind with the Debtors, when the value of the cash (approximately $3.2 Million), accounts receivable ($300K), and GERS Litigation ($10 Million) is subtracted from the $11 Million credit bid, the net value to the estate is net negative $1.225 Million. Even if the Court were to consider the astronomical $2 Million in litigation costs Ensign Peak says will be saved by settling the GERS litigation and the $2 Million in premiums not being paid, the value to the estate is still only net positive $2.775 Million. Consequently, assuming arguendo that the Ensign Initial Credit was on behalf of Wells Fargo, then Wells Fargo's sole credit bid was not higher than any of the cash bids, much less TSG's $10.4 Million bid.

**D.     Neither Ensign Peak Nor Wells Fargo has a Security Interest in the Debtor's Claims and Causes of Action.**

*i.     Ensign Peak and Wells Fargo cannot credit bid for the litigation and Avoidance Actions.*

42.     Perhaps most problematic with Ensign Peak's multiple credit bids is that these various bids attempt to credit bid for the purchase of claims and causes of action (including "Avoidance Actions" and the claims asserted in the GERS Adversary) belonging to the Debtor

when neither Ensign Peak nor Wells Fargo have liens on those assets. Section 363(k) of the Bankruptcy Code provides:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k). Put differently, a creditor ***must have a lien on the assets*** in which it elects to credit bid. *See In re CS Mining, LC,* 574 B.R. 259, 283 (Bankr. D. Utah 2017) (citing Collier on Bankruptcy ¶ 363.09 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.); *see also In re CHL, LLC*, Case No. 18-00630, 2018 WL 3025310, at *4 (Bankr. E.D.N.C. June 14, 2008) ("Section 363(k), in turn, requires that a lienholder be permitted to credit bid at a sale free and clear of liens, 'unless the court for cause orders otherwise.'"); *In re Diebart Bancroft*, Case No. 92-3744, 1993 WL 21423, at *5 (E.D. La. Jan. 26, 1993) ("[Section] 363(k) allows a lienholder to bid its lien, unless the court for cause orders otherwise."); *In re 222 Liberty Assoc.*, 108 B.R. 971, 979 (Bankr. E.D. Pa. 1990) ("Section 363(k) permits a lienholder to bid up to the entire amount of its lien when property is sold out of the ordinary course of business"). The Indenture does not create a security interest or lien on the Debtors' claims and causes of action. As such, neither Ensign Peak nor Wells Fargo have a lien on certain of the assets (the claims and causes of action) they are attempting to credit bid.

43.    Debtors' counsel agreed on the record, explaining on April 22, 2019 (after the First Adjournment):

> The Debtors had raise the issue of whether or not Ensign Peak could credit bid on the – on causes of action, including the GERS litigation, as it was the Debtor's position that causes of action like that were not covered by Ensign Peak liens under the indenture.

Although Ensign Peak contests the Debtors' position, Ensign Peak's actions appear to indicate otherwise. In response to the Debtors' position, Ensign Peak rewrote the definition of "Purchase Price" in the Ensign Second Revised Credit Bid APA such that the sum of the "Residual Amount, Break-Up Fee and Expense Reimbursement, Allowed Claims Amount and Assumed Liabilities" are now defined as the "Cash Amount."[60] Both Debtors' counsel and Ensign Peak's counsel on the record acknowledged that the change was a "significant structural change[]."[61]

44.    Even if the Indenture did grant a security interest on the Debtors' claims and causes of action (which it doesn't) the Indenture certainly did not grant a lien on "Avoidance Actions." Section 552 of the Bankruptcy Code provides:

> Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

11 U.S.C. § 552(a). Because the "Avoidance Actions" are a function of the Bankruptcy Code, they did not exist prior to the Petition Date. Consequently, any prepetition security agreement, including the Indenture, cannot create a lien on such "Avoidance Actions." *See In re Tek-Aids Industries, Inc.*, 145 B.R. 253, 256 (Bankr. N.D. Ill. 1992); *In re Pearson Industries, Inc.*, 178 B.R. 753, 764-65 (Bankr. N.D. Ill. 1995); *In re Ludford Fruit Productions Inc.*, 99 B.R. 18, 24-25 (Bankr. C.D. Ca. 1989); *In re Integrated Testing Products Corp.*, 69 B.R. 901, 904-05 (D.N.J. 1987). By this same logic, a number of the Debtors' counterclaims asserted in the GERS Litigation based upon section 510 (subordination), 547 (preference), 502(d) (disallowance), 544(b) (fraudulent transfer and strong-arm); and 550 (recovery) are not subject to any liens and thus Ensign Peak cannot credit bid on these assets.

---

[60] *See* Ensign Second Revised Credit Bid APA at 7.
[61] *See* Transcript at 60:24-25.

45.     At a bare minimum, any such lien that Ensign Peak or Wells Fargo may assert on the Debtors' claims and causes of action is subject to a bona fide dispute and thus the Bid Procedures expressly prohibit any credit bid on those claims. The Bid Procedures expressly state:

> a person or entity holding a perfected security interest in any such Property may, pursuant to section 363(k) of the Bankruptcy Code, seek to credit bid some or all of its claims secured by such security interests for the property in which it holds such security interest (each such bid, a "Credit Bid"), provided that such claims and/or security interests are not subject to a bona fide dispute.

See Bid Procedures at ¶ 12. Because the Indenture does not provide a lien on those assets, and section 552 makes clear that any lien that may have been created pursuant to the Indenture would not attach to the "Avoidance Actions" then at a minimum such liens are subject to a bona fide dispute and neither Ensign Peak nor Wells Fargo can credit bid to purchase those assets.

> ii.     The "Cash Amount" in the Ensign Final Credit Bid APA is illusory.

46.     Although the Ensign Final Credit Bid APA defines "Cash Amount" to include "Residual Amount, Break-Up Fee and Expense Reimbursement, Allowed Claims Amount and Assumed Liabilities," the Residual Amount, Break-Up Fee and Expense Reimbursement, and Allowed Claims Amount are all being paid out of the cash the Debtors currently have on hand, and which Wells Fargo and Ensign Peak assert is cash collateral. Put differently, Ensign Peak is using the Debtors' cash (which it asserts a lien on) to pay the Cash Amount. Essentially, Ensign Peak (or Wells Fargo if Wells Fargo is the bidder on behalf of Ensign Peak) is merely credit bidding a portion of its lien on cash to pay for the litigation assets, including the Avoidance Actions. Because neither Ensign Peak nor Wells Fargo has a lien on those claims and causes of action, it cannot credit bid (even credit bid its lien on cash) for those litigation claims and causes of action and thus the Court should decline to approve the sale to Ensign Peak or Wells Fargo.

**E.    Ensign Peak's Credit Bid APA Contains Impermissible Releases.**

47.    The various Ensign Peak credit bids are practically a disguised *sub rosa* plan. Among other things, the Final Ensign Credit Bid APA provides for a multitude of releases. Specifically, the Final Ensign Credit Bid APA provides that the Debtors are fully releasing Ensign Peak, the Trustee and GERS, including all of the claims in the GERS Litigation.[62] At the outset, Ensign Peak's counsel announced that Ensign Peak's credit bids "resolves the outstanding litigation with GERS."[63] Compromises and settlements in bankruptcy are subject to bankruptcy court approval. *See* Fed. R. Bankr. P. 9019. Likewise, creditors are entitled to notice of any proposed settlements and the opportunity to weigh-in on the merits of any settlement. *See* Fed. R. Bankr. P. 2002(a)(3). Nothing in the Sale Motion mentions any settlement of any claims or causes of action, especially not settlement of the type of significant litigation that is the basis of the GERS Adversary. The TSG APA (i.e., the stalking horse APA on the docket and referenced in all of the Sale Notices sent to creditors) has no settlements or compromises in it. Thus, in the eyes of the creditor body as a whole, there is absolutely no notice that the Debtors are settling claims and causes of action. To approve the Ensign Final Credit Bid APA with the releases contained therein would be blatantly violative of both Federal Rule of Bankruptcy 2002 and 9014. Consequently, the Court should deny the sale to Ensign Peak.

## CONCLUSION

48.    Since the beginning of the Auction, the process can be characterized as a series of gaffes and errors. Ensign Peak never submitted a "Qualified Bid" and thus should not have been allowed to participate from the very beginning. After ignoring the plain language of the Bid Procedures, Debtors' counsel allowed Ensign Peak to participate but acknowledged issues with

---

[62] *See* Ensign Final Credit Bid APA at § 7.08.
[63] *See* Transcript of Auction at 6:20 – 7:8.

Ensign Peak credit bidding on assets it did not have a lien. Undeterred, Debtors counsel continued negotiating with Ensign Peak behind the scenes, adjourning the auction four separate times so that it could "work through" issues with Ensign Peak's various credit bids. In the end, the Debtors and their counsel accepted a bid that was not only violative of the Bid Procedures, but violative of the Bankruptcy Code (credit bidding on assets in which there is no lien) and Federal Rules of Bankruptcy Procedure. In a time where chapter 11 cases are moving towards section 363 sales, and further away from plans of reorganization and the procedural protections attendant therewith, bid procedures to govern the auction and sales process are vitally important to ensure fundamental fairness in the process. The Bid Procedures in this case were entered by this Court and all of the parties were fully aware of them. Debtors' counsel in this case chose to ignore those procedures and instead negotiate a transaction that is insupportable by the Bid Procedures, the Bankruptcy Code and the Bankruptcy Rules. Consequently, the Court should deny the sale to Ensign Peak and/or Wells Fargo, and instead approve the sale to Back-Up Bidder, The Settlement Group, Inc.

WHEREFORE, based upon the foregoing, TSG requests entry of an order sustaining the objection, ordering the Debtors to close with the Back-Up Bidder, The Settlement Group, Inc., and granting such other and further relief as may be just and appropriate.

Dated: April 28, 2019
      Wilmington, Delaware         Respectfully submitted,

**BARNES & THORNBURG LLP**

*/s/ Kevin G. Collins*_____
David M. Powlen (DE Bar No. 4978)
Kevin G. Collins (DE Bar No. 5149)
1000 N. West Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 300-3434
Facsimile: (302) 300-3456
Email: David.Powlen@btlaw.com
Email: Kevin.Collins@btlaw.com

-and-

**PRONSKE & KATHMAN, P.C.**

Gerrit M. Pronske (*pro hac vice*)
Jason P. Kathman (*pro hac vice*)
2701 Dallas Parkway, Suite 590
Plano, TX 75093
Telephone: (214) 658-6500
Facsimile: (214) 658-6509
Email: gpronske@pgkpc.com
Email: jkathman@pgkpc.com

**COUNSEL FOR**
**THE SETTLEMENT GROUP, INC.**